# Staunton

UNITED STATES FIDELITY AND GUARANTY COMPANY V. WILLIAM H. CARTER, ET AL.

September 21, 1933.

Present, ·Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*Funkhouser, Apperson & Whittle, Roger B. Copinger, R. L. Savage, Jr., R. E. Booker* and *Fred B. Gentry,* for the appellant.

*John W. Carter, Jr., R. C. Clement, E. C. Hurt, Jr.,* and *George E. Allen,* for the appellees.

EPES, J., delivered the opinion of the court.

On December 31, 1930, the Chatham Savings Bank, a bank of deposit, created and existing under the laws of the State of Virginia (hereinafter referred to as the bank), suspended payment and closed its doors. Thereafter the State Corporation Commission of Virginia filed in the Circuit Court of Pittsylvania county its bill in chancery against the bank for the purpose of having its affairs wound up and its assets distributed among its creditors. At the time the bank closed its doors, W. E. Ramsey, the treasurer for Pittsylvania county, Va. (hereinafter referred to as the treasurer), had on deposit in this bank on checking account $26,078.95. All the funds which had gone to make up this deposit had been received by the treasurer in the performance of his official duties as treasurer from the collection of State taxes and county levies; but the record does not show separately the amounts thereof which had come from the collection of State taxes and county levies, respectively.

The bank, with United States Fidelity and Guaranty Company, of Baltimore, Md. (hereinafter called the appellant), as its surety, had executed "to W. E. Ramsey, treasurer of Pittsylvania county, Virginia," a bond in the penalty of $75,000 conditioned as follows: "The condition of this obligation is such that if the principal shall during the term of this bond faithfully account for and pay on legal demand all moneys deposited with it by or on behalf of said obligee, and shall not suspend payment during the term

hereof, this obligation shall be null and void, otherwise to remain in full force and effect."

After the bank failed, Ramsey brought his action at law against the receivers of the bank and the appellant on this bond to recover the amount he had on deposit therein as treasurer. On September 30, 1930, judgment was rendered in his favor against the receivers and the appellant for $26,078.95, with interest from December 1, 1930, and costs. On October 7, 1931, Ramsey filed his petition in the chancery cause in which he alleged that he had recovered this judgment against the receivers of the bank and the appellant, and that it was for money which he had on deposit in the bank which had come from the collection of State taxes and county levies; and prayed that the court would decree that he was on that account entitled to have his judgment paid from the assets of the bank in the hands of the receivers before any payment was made to the general creditors.

On November 21, 1931, the appellant paid to Ramsey, as county treasurer, the full amount of this judgment. At the time the judgment was paid, Ramsey assigned to appellant "any and all rights and claims either at law or in equity which the undersigned treasurer of said county and/or the county of Pittsylvania and/or the Commonwealth of Virginia may have against said bank or its said receivers to a preferred claim against the assets of said bank to be paid all of said deposits and the interest thereon from December 1, 1930, * * * before any amount is paid to the unsecured or unpreferred creditors of said bank from the assets thereof, to the end that said United States Fidelity and Guaranty Company, a corporation, its successors and assigns may become substituted and subrogated to any and all rights of every kind and character which the undersigned treasurer and/or the county of Pittsylvania and/or the Commonwealth of Virginia may now or hereafter have to recover the said tax monies so deposited and the interest thereon, including the right of

said United States Fidelity and Guaranty Company, its successors or assigns to be substituted as the claimant or petitioner in the proceedings which the undersigned is now conducting against said bank and its said receivers in the Circuit Court of Pittsylvania county, Virginia, in the chancery cause therein pending of State Corporation Commission of Virginia against Chatham Savings Bank. * * *"

The appellant then filed its petition in the chancery cause in which it asserted that the Commonwealth of Virginia and Pittsylvania county, and/or the treasurer were entitled to a preferred claim against the assets of the bank in the hands of the receivers for all tax moneys of the Commonwealth of Virginia and/or Pittsylvania county which the treasurer had on deposit on the bank at the time it failed; and that the appellant had succeeded to and become entitled to be subrogated to all the rights of the Commonwealth, Pittsylvania county and the treasurer to a preferred claim against the assets of the bank. The petition prayed that the court would decree that the appellant was entitled to be paid the sum of $26,078.95, with interest from December 1, 1930, before the claims of any other unsecured or unpreferred creditors should be paid.

At the time this petition was filed and the decree appealed from was rendered, the assets of the bank in the hands of the receivers, subject to no liens or other priority, were amply sufficient to pay the amount of Ramsey's judgment which had been paid by the appellant.

The court entered a decree adjudging that appellant was entitled to share as a general creditor in the distribution of the assets of the bank, but was not entitled to any preference or priority. From this decree the appellant has appealed.

The contention of the appellant that the court erred in holding that it is not entitled to a preference is predicated upon the following legal premises which it asserts are true:

(1) By the common law of England, the king, or crown, had the right by prerogative to have all debts due by an insolvent debtor to him, or it, paid in preference to a debt due by his, or its, debtor to any other creditor who did not have an antecedent lien.

(2) By its adoption of the common law of England, the Commonwealth of Virginia succeeded to the right of the king, or crown, to be preferred in the payment of his, or its, debts, and therefore the Commonwealth is entitled to have all debts of whatever kind due to it by an insolvent debtor paid in preference to a debt due by its debtor to any other creditor, who has not acquired an antecedent lien.

(3) A county is entitled at common law to the same rights of priority to which the Commonwealth is entitled.

(4) There is no statute in Virginia which authorizes a county treasurer to deposit public funds in a bank; and by virtue of section 362[1] of the Tax Code of Virginia (Acts 1928, c. 45, p. 206) a county treasurer is prohibited from making a general deposit with a bank of public moneys. If he does deposit public funds in a bank, the bank is to be deemed to have received such funds in trust for the Commonwealth and/or the county; and, by virtue of its common law right of priority, the Commonwealth or the county is entitled, if the bank becomes insolvent, to have the amount of its funds so deposited paid to it in preference to the claims of the bank's general depositors and other unsecured creditors, notwithstanding the fact that the funds so deposited cannot be traced into the hands of the receivers.

(5) The right of the Commonwealth or the county to be preferred in its claim for public funds deposited by it or its officers in a bank, is not waived or abrogated by sec-

---

[1] "Section 362. Treasurer not to use or lend public money.—If any treasurer or deputy of any treasurer shall lend any money belonging to the State, city, or county, with or without interest, or use the same for any purpose other than such as may be provided by law, he shall be guilty of malfeasance in office."

tion 50,[2] c. 507, Acts 1928, p. 1325 (section 4149 (49), Michie's Code, Va. 1930), or any other statute. On the contrary, any statute which purported to authorize the deposit of public funds in a bank by the Commonwealth, or a county, or by any officer or agent thereof, without such deposit being given priority, would be unconstitutional by reason of the provision of section 185[3] of the Constitution of Virginia.

(6) A county treasurer who has made deposits of public monies in a bank in his name as treasurer is entitled to assert for the Commonwealth and/or the county their rights of priority in proceedings brought by him to recover from the bank the public funds deposited therein by him.

(7) If the bank has given a bond with surety to secure the public monies deposited by him therein, and the surety, upon the bank's becoming insolvent, pays to the treasurer the amount of public money which he then has on deposit therein, the surety is entitled both under the common law and by the provisions of section 5777, Code Va. 1919, as amended by Acts 1926, c. 504, pp. 854, 855, to be subrogated to the rights of priority which the Commonwealth and/or the county had for the recovery of the funds so deposited.

---

[2] This section provides in part as follows: "No bank or trust company shall give preference to any depositor or creditor by pledging the assets of such bank or trust company, except as otherwise authorized in this section; provided; * * * and further provided, that any bank or trust company may deposit securities for the purpose of securing deposits of the United States government, and its agencies, and the Commonwealth of Virginia, and its political subdivisions, and for the purpose of securing sureties on surety bonds furnished to secure such deposits. * * *" There are other provisions and exceptions made in this section, but they are not material here.

[3] So far as it is pertinent here, section 185 of the Constitution reads as follows:

"Neither the credit of the State, nor of any county, city or town, shall be, directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporation, nor shall the State, or any county, city, or town subscribe to or become interested in the stock or obligations of any company, association, or corporation, for the purpose of aiding in the construction or maintenance of its work. * * *"

The appellant's major premise, upon which its whole contention rests, is that, by virtue of the adoption by Virginia of the common law of England, the Commonwealth became entitled, in the absence of any statutory provision to the contrary, to have a debt due to it from an insolvent bank, which has arisen from the deposit of public funds therein for or by it, paid in preference to the general depositors and other general creditors of the bank. If this be not true, there is no basis for the preference to which it contends the county and county treasurer are entitled.

To determine whether this primary contention of the appellant is well made, it is necessary to consider two questions: (1) What was the common law of England, as understood at the time of the American Revolution, with reference to the right of the king, or crown, to have his, or its, debt paid in preference to a debt due by his, or its, debtor to another creditor? (2) To what extent, if any, has the Commonwealth of Virginia adopted the common law of England on this subject as being applicable to debts due it; or (to use the usual phraseology) to what extent, if any, did it succeed to the rights of the king, or crown, under the common law of England to have his, or its, debts preferred?

To correctly answer the second question it is requisite that we have a somewhat comprehensive view of the scope of the rules of the common law of England relating to the right of the king, or crown, to be preferred in the collection of his, or its, debts, their *raison d'etre,* the statutory modifications thereof which were made prior to the American Revolution, and the remedies given to the king, or crown, for the enforcement of his, or its, right of preference.

From a very early time the common law of England gave, or rather recognized, the king's assertion of a right by prerogative, to have a debt due to him by one of his subjects paid in preference to a debt due by his debtor to one of his subjects. This right existed regardless of the

solvency or insolvency of the king's debtor;[4] and it was not limited to the collection of taxes, duties, and other public revenue. It extended to the collection of all debts due to the king whether due him in his capacity as sovereign or in his capacity as a proprietor, *i. e.*, whether they were debts due the government, or even his personal debts.[5] So plenary was this prerogative right, that the common law gave the king as a remedy for its enforcement the right to issue to his debtor a writ of protection, which had the effect of preventing him from being sued or attached at all by any of his other creditors until he had paid the king's debt. Though another creditor had procured a judgment against the king's debtor and had levied a writ of *fieri facias* or elegit on his property, if the king instituted his suit before the sheriff had made sale of the chattels levied upon under the *fieri facias,* or had made delivery to the plaintiff of the chattels and lands levied upon under the writ of elegit, the king was entitled to have his demand satisfied before the subject could have satisfaction out of the property levied upon by him. 1 Coke Litt. 131b; *Sir Edward Coke's Case* (1632), Godbolt 289, 78 Eng. Rep. Reprint, 169; 3 Blackstone's Com. (1765-1769), pp. 419, 420; *Giles* v. *Grover,* 1 H. L. C. 72, 11 Eng. Rul. Cas. 550, 25 Edw. 3, c. 19, 33 Henry 8, c. 39.

This prerogative right of the king extended at common law even further than is above indicated. The king had the right to seize a debt due to his debtor for the satisfaction of his debt. This right was not limited in application to a debt due the king's debtor. It extended to a debt due the debtor of a debtor of the king's debtor, and so on to any number of degrees, until, by rule of the Court of Exchequer adopted in the reign of Charles I, it was restricted so as not to apply beyond the third degree.

---

[4] *Sir Edward Coke's Case* (1632), Godbolt 289, 78 Eng. Rep. Reprint, 169, cited in text.

[5] This is the inference from the language of the cases dealing with this subject, and seems plain from the provisions of 33 Henry 8, c. 39, section 73.

When the king instituted proceedings to seize any such debt, he became at once entitled to the same priority with respect to the debt seized as he would have had if the debt had been due directly to him. Not only was this true, but upon a plaintiff's suggesting that he was indebted to the king, he was given the same right of priority over the creditors of his debtor that the king would have been entitled to if the king had seized the debt for the satisfaction of his debt.[6] *Attorney General* v. *Poultney* (1665), Hardros 403, 145 Eng. Rep. Reprint, 519; *Sir Edward Coke's Case, supra;* Chittey's Blackstone, Book 1, p. 420, note 16.

The existence under the common law of the prerogative right of the king to have his debt paid in preference to that of any other creditor is clearly recognized in the statute 25 Edw. 3, ch. 19 (1350-52), by which its scope was materially curtailed. This statute, after reciting the issuance of writs of protection by the king, provides: "That notwithstanding such protections the parties which actions against their debtors, shall be answered in the king's court by their debtors; and if judgment be thereupon given for the plaintiff or demandant, the execution of the same shall be put in suspense, till satisfaction be made to the King of his debt. And if the creditors will undertake for the King's debt, they shall be thereunto received, and moreover shall have execution against their debtors of the debt due to them, and also shall recover against them as much as they shall pay to the king for them."

The king's prerogative right to preference under the common law was again clearly recognized, and its scope again curtailed by the statute 33 Henry 8, c. 39, section 74 (passed 1541-42), which reads:

"And be it also enacted by the Authority aforesaid,

---

[6] This right was in full force at the time of the American Revolution, but was the subject of so much abuse that it was greatly curtailed and practically abolished by the Extents in Aid Act of 1817, 57 Geo. 3, c. 117. See 9 Halsbury's Laws of Eng. (2d Ed.), Crown Practice, p. 674, note m.

That if any Suit be commenced or taken, or any Process be hereafter awarded for the King, for the Recovery of any of the King's Debts, that then the same Suit and Process shall be preferred before the Suit of any Person or Persons: And that our said Sovereign Lord, his Heirs and Successors shall have first Execution against any Defendant or Defendants, of and for his said debts, before any other Person or Persons, *so always that the King's said suit be taken and commenced, or Process awarded for the said Debt at the Suit of our said Sovereign Lord the King, his Heirs or Successors, before Judgment given for the said other Person or Persons.*"[7]   (Italics ours.)

At common law a judgment of a private person did not bind or affect any of the lands of the judgment debtor; but by 13 Edw. 1, ch. 8 (1285), the writ of elegit was created and a judgment of a private person was thereby made a lien upon *one-half* of the debtor's lands from the beginning of the term at which the judgment was rendered.[8]   But even then the judgment debtor was not entitled to have the moiety of his debtor's land sold to pay his judgment, but only to hold possession of it until he was satisfied out of the rents and profits.   3 Blackstone Com. 418-420.

---

[7] See section 2433, Code Va. 1919, providing for lien of Commonwealth on all property of a county treasurer from time action is commenced against him.

[8] This continued to be the law in Virginia until the Code of 1849, when for the first time a judgment of a private person was made a lien upon *all* the lands of his debtor.   Act of December 13, 1792, 13 Hen. St. 257; 1 Rev. Code 1819, c 13. p. 524; Reports of Revisors 1849, p. 921; Code 1849, c. 187, section 8; 2 Minor's Inst. (2d Ed.), p. 265 *et seq.; Leake* v. *Ferguson* (1846), 2 Grat. (43 Va.) 420, 435-440. Though only the possession of the moiety of the land could be taken by a judgment creditor under a writ of elegit, not long before the American Revolution, "equity taking upon itself to carry into full effect the lien thence arisen" came to the practice of decreeing a *sale* of the moiety of the land upon which the judgment was a lien, wherever the rents and profits thereof would not in a reasonable time satisfy the debt; and this practice was followed in Virginia before there was any statute on the subject.   2 Minor (2d Ed.) 273.   However, this comparatively new jurisdiction of a court of equity was considered as somewhat uncertain in Virginia until it was made statutory by Code 1849, c. 186, section 9; Code 1919, section 6472.   See, also, Reports of Revisors, 1849, p. 918, note.

The rule was very different as to judgments of the king. Under the common law the king's judgment bound or affected *all* the lands of his debtor;[9] and in the case of the king's accountants, collectors, receivers, and other officers enumerated in 13 Eliz., ch. 4, all the lands which the officer had *at or after the time of his entry into office* was bound, both at common law and under that statute, for the debts of such officer to the king for any defalcations made by the officer. To such extent was this true that, if any such officer aliened any of his land after entry upon his office, it was liable to the king's debt even in the hands of a *bona fide* purchaser for valuable consideration, though the debt due the king was contracted by the vendor many years after the alienation. 3 Blackstone Com., p. 320; *King* v. *Smith* (1810), Wightwick 34, 45, 145 Eng. Rep. Reprint, 1164, 1168; *Leake* v. *Ferguson,* 2 Grat. (43 Va.) 420, 435. So, also, the king was entitled to have all the lands that such an officer had at or after he entered upon his office subjected to the payment of his debt, though it had arisen after another creditor had procured a judgment against the officer and a moiety of his land had been delivered to the judgment creditor under a writ of elegit.[10]

---

[9] In *Nimmo's Ex'r* v. *Com.* (1809), 4 Hen. & M. (14 Va.) 57, 4 Am. Dec. 488, it was held, says Allen, J., in *Leake* v. *Ferguson,* 2 Grat. (43 Va.) 420, 438, "that this branch of the [king's] prerogative was not in force in Virginia, or was disaffirmed by the act of 1788" (12 Hen. St. 558; 2 Rev. Code, 1819, c. 189, sections 8-10), which provided that a judgment of the Commonwealth against a "sheriff, coroner or other public collector" should bind *all* the lands of such officer "from the date thereof," and that they might be levied upon and sold under a *fieri facias* issued upon such judgment. On the authority of *Nimmo's Case* it was held in the later case that only a moiety of a *general public debtor* could be subjected to the payment of a judgment of the Commonwealth against him.

By the act of February 23, 1822 (Sup. Rev. Code, 1833, p. 389) the act of 1788 was made general and applied to all judgments of the Commonwealth "against any public officer or agent or *against any public debtor and their sureties,* or against any of them;" and sections 2517-2530, Code Va. 1919, now so provides.

[10] This would seem to have been modified by 33 Henry 8, c. 39, section 74, heretofore quoted, but we have found no case so deciding.

Prior to 1541-42 the king's prerogative right to be preferred in the payment of his debts was enforced in other ways; but by 33 Henry 8, ch. 39, section 55, it was provided that it might be enforced by *"capias, extendi facias*,[11] *subpeone,* attachments and proclamation of allegiance, if need shall require, or any of them, or otherwise as unto the said several courts shall be thought by their discretion for the speedy recovery of the king's debts." After that time it was generally enforced by a writ of extent, of which there were three kinds, extent in chief, extent in chief in the second, third or fourth, etc., degree. and extent in aid.[12]

An extent in chief, of whatever degree, was a summary process by which the king's action was commenced against his debtor and his body, personal property (tangible and intangible), and lands at once seized for the satisfaction of the king's debt. It more nearly resembled our writ of attachment than any other writ known to the

[11] Originally the writ of extent lay to enforce judgments in cases of recognizances or debts acknowledged on statutes merchant or staple. It was for the first time made applicable to debts due the king by this statute.

So far as we can ascertain the writ of extent never has been expressly abolished by statute in Virginia, as was the writ of elegit in 1872. But we can find no trace of its ever having been used in Virginia. In *Leake* v. *Ferguson,* 2 Grat. (43 Va.) 420, 435, 436, Judge Allen seems to regard the act of 1788 (12 Hen. St. 558), entitled "An Act for the more speedy recovery of debts due to this Commonwealth," as having abrogated by implication its use by the Commonwealth, and as having substituted therefor a *fieri facias.* So far as it was available to private persons it would seem to have been abolished by implication by the act of 1792 (13 Hen. St. 357), entitled "An Act for reducing into one, the several acts concerning executions, and for the relief of insolvent debtors," which provides that a judgment creditor might at his election "prosecute writs of *fieri facias,* elegit, and *capias ad satisfaciendum,*" but omits any provision for a writ of extent. See, also, in this connection act of 1789 (13 Hen. St., c. 17, p. 23).

[12] An extent in chief was the writ used by the king against his debtor. An extent in chief of the second or third, etc., degree was the writ used by the king against a debtor of his debtor, etc. An extent in aid was the writ used by a debtor of the king against his debtor to enforce the right of preference given to him because of his indebtedness to the king. See *Rex* v. *Shackle,* 11 Price 772. For writs of extent on behalf of the crown, see 9 Halsey's Law of Eng. (2d Ed.), sections 1147, 1158.

present-day practice in Virginia; and as said in Marshall Ex. p. (1751) 1 Atk. 262, it was "both an action and an execution in the first instance." It ordered the sheriff to seize the debtor and his goods and chattels, lands and tenements, debts, credits, specialties and sums of money of the debtor in the county; and they could *all* be seized at once *whatever the amount of the debt*. *Harbert's Case* (1584) 3 Coke, 11 b, 76 Eng. Rep. Reprint, p. 674; 9 Halsbury's Laws of Eng. (2d Ed.), section 1152. It was "analogous in effect, when perfected by the taking of an inquisition, with the old writ of protection, by which the debts due to crown debtors were secured to satisfy the crown." *Lakeman* v. *M'Adam* (1820), 8 Price 576, 582, 146 Eng. Rep. Reprint, 1300.

With reference to writs of protection, in *Giles* v. *Grover, supra,* Mr. Justice Patterson says in his opinion, "such writs of protection have long since ceased; and Lord Coke says that he ·cannot say anything of them from his own experience,[13] but there is no doubt that they were in use at the time of the passing of 33 Hen. VIII." However, Coke recognized the king's right to issue writs of protection at the time he wrote, as did the court in *Sir Thomas Sherley's Case,* Hobart 115, which was decided between 1603-1625.

■ But as to the king's prerogative right of preference, there can be, we think, no question that, both in the fourth year of the reign of James the First and also at the time of the American Revolution, the king was entitled by prerogative under the common law of England (as modified by the limitations imposed for the benefit of the subject by 33 Henry 8, c. 39, section 74) to have the payment of a debt (public or private) due him preferred to the payment of a debt due by his debtor to any of his subjects, regardless of ·the solvency or insolvency of the debtor; and that this right of preference extended to cases in which the king sought to seize the debt of his debtor, or the king's debtor sued his debtor.

---

[13] Coke Litt. 131 b.

Lord Coke says that the reason of this rule of the common law is that *"thesaurus regis est fundamentum belli, et firmamentum pacis."* Coke Litt. 131 b. In *Sir Edward Coke's Case, supra,* Dodderidge, one of the justices of the king's bench, said: "1. I observe that from age to age what care the judges had for the advancing and the recovering of the kings debts; because *thesaurus regis est vinculum pacis and bellorum nervus,* and it is the flowing fountain of all bounty unto the subject. 2. I observe, that the king hath a prerogative for the recovery of debts due unto him. 3. I observe, that although the debt due to the king be *puisne* or the lesser debt, and although the debtor be able and sufficient to pay both debts, *viz.,* the kings debt and the debt owing to the subject, yet the kings debt is to be first paid." In these observations the reporter says that Hobart, Lord Chief Justice of the Common Pleas, Tonfield, Chief Baron, and Ley, Chief Justice of the King's Bench, concurred. And several of the courts of the United States have stated that this prerogative of the king was founded upon motives of public policy and designed in order that the king as the sovereign of the kingdom might secure and conserve the public revenues for governmental purposes. *Aetna Acc. & Liability Co.* v. *Miller,* 54 Mont. 377, 170 P. 760, L. R. A. 1918C, 954; 51 A. L. R. note, page 1356 *et seq.*

In speaking of the right of the king to have *all* of his debtor's land subjected to the payment of his debt, instead of only a moiety, as was the right of a private judgment creditor, Judge Allen, in delivering the opinion of the court in *Leake* v. *Ferguson,* 2 Grat. (43 Va.) 420, 436, says: "Though this arises from the royal prerogative, it is not a prerogative incident to the person of the king, but attaching to him in his political character as head of the State, and for the public weal. The reason for its existence is as applicable to the government now as it was before the revolution. * * * In the absence of any statute of Virginia, or decision of this court, there would be nothing

in the nature of our institutions, or the preference claimed, to authorize us in saying that the Commonwealth had not the same rights which by the common law were possessed by the king." But he further remarks that "it is most probable the legislature did not consider the common law in regard to the king's prerogative in force in Virginia," when it enacted the statute of 1788 referred to in note 8, *ante,* and accepts the decision of the court in *Nimmo's Ex'r* v. *Com.,* 4 Hen. & M. (14 Va.) 57, 4 Am. Dec. 488, as having decided that "this branch of the prerogative was not in force in Virginia, or was disaffirmed by the act of 1788."

To a degree these observations as to the *raison d'etre* of these prerogative rights of the king are true. But in the light of English history and the scope of the rules of the common law of England giving to the king the right to be preferred in the payment of debts due to him, we find it impossible to disassociate them and their *raison d'etre* from the conception of the king as a personage entitled to these rights as prerogatives of his person, as well as governmental rights to be exercised by him as the head of the government. They are inextricably interwoven with this conception in their origin, development, and application. This is indicated by their scope and exemplified by their application to the private, or proprietary, debts of the king as well as to the collection of the public revenue, and to cases in which the king had seized a debt of a debtor of his debtor, and so on to any number of degrees.

The Convention of May, 1776, which declared our separation from England, ordained that "the common law of England, all statutes or acts of Parliament made in aid of the common law prior to the fourth year of the reign of King James the First, and which are of a general nature, not local to that kingdom, together with the several acts of the General Assembly of this colony, so far as the same may consist with the several ordinances, declarations, and resolutions of the general convention, shall be

the rule of decision, and shall be considered in full force, until the same shall be altered by the legislative power of this colony." 9 Hen. St. p. 127, section 6; 1 Rev. Code 1819, c. 38, p. 135.

This convention also ordained a Constitution for the newborn Commonwealth. In section 9 thereof, which relates to the Governor, it was provided that "he shall, with the advice of a Council of State, exercise the executive powers of government according to the laws of this Commonwealth; and shall not, under any pretense, exercise any power or prerogative by virtue of any law, statute, or custom, of England." 1 Rev. Code 1819, p. 35. While this provision of our first Constitution is not in any sense controlling on the question here under consideration, it does throw light upon it.

By an act passed in 1789 (13 Hen. St., c. 17, p. 23), it was provided that so much of the ordinance of 1776 "as relates to any statute or act of parliament, shall be and is hereby repealed;" but its effective date was postponed until January 1, 1791, in order that the General Assembly might "enact such of the said statutes as to them appear worthy of adoption." The suspension of this act was by subsequent statutes continued in force until after the revisors who had been appointed to revise the laws had reported; and it remained suspended until the act of December 27, 1792 (1 Hen. St. New Series, 199). By this act it was provided that so much of the ordinance of 1776 "as relates to any statute or act of parliament shall be, and is hereby repealed;' but it contained this saving clause: "Saving moreover to this Commonwealth, and all * * * persons, bodies politic and corporate * * * the rights and benefits of all and every writ and writs, remedial and judicial, which might have been legally obtained from or sued out" of any court or clerk's office "before the commencement of this act."

The statutes on this subject remained in this shape until the Code of 1849, when what are now sections 2 and 3 of

the Code of 1919,[14] which are merely a restatement without change of the then existing law on this point, were enacted.

■ There can be no doubt that Virginia has adopted the principle of the common law of England that the sovereign power of a State has the power and authority to provide, *if it deem proper,* that all debts due the government (*i. e.,* to the State) shall be paid by its debtor in preference to a debt due to a private person or corporation. The power to so provide is an incident of sovereignty, and the Commonwealth of Virginia unquestionably succeeded to it when she separated from England and became a sovereign State. But the question here is, To what extent, if any, have the sovereign people of Virginia so provided by the adoption of the common law of England?

Though it has been more than 157 years since Virginia separated from England, this is the first time, so far as we can ascertain, that this question has been before this court. The nearest approach to a consideration of this or an allied question, which we have found, are the opinions in the cases of *Nimmo's Ex'r* v. *Com.,* 4 Hen. & M. (14 Va.) 57, 4 Am. Dec. 488, and *Leake* v. *Ferguson,* 2 Grat. (43 Va.) 420. In these cases the court gave some consideration to the question whether or not the common law prerogative right of the king to subject *all* its debtor's land to the payment of his debt had been adopted as applicable to debts due the Commonwealth. But even on this question these cases are inconclusive.

---

[14] Section 2, Code Va. 1919: "Common law of England, so far as it is not repugnant to the principles of the Bill of Rights and Constitution of this State, shall continue in full force within the same, and be the rule of decision, except in those respects wherein it is or shall be altered by the General Assembly." (Code 1849, c. 16, section 1.)

Section 3, Code Va. 1919: "The right and benefit of all writs, remedial and judicial, given by any statute or act of Parliament, made in aid of the common law prior to the fourth year of the reign of James the First, of a general nature, not local to England, shall still be saved, so far as the same may consist with the Bill of Rights and Constitution of this State and the Acts of Assembly." (Code 1849, c. 16, section 2.)

In other States where the question has been considered we find a great diversity of opinion as to what extent, if any, a State, by adopting the common law of England, has adopted, as applicable to debts due it, the rules thereof relating to the prerogative right of the king to have the payment of his debts preferred. The cases on this subject are collected and digested in the authorities cited in the footnote,[15] and we shall not again digest them here.

A majority of the courts which have considered this question (including the Supreme Court of Appeals of West Virginia) have reached the conclusion that a State, by adopting the common law of England, became entitled to a preference over private creditors whose claims stand on the same footing as to liens as the claims of the State, and that by the common law where public funds are on deposit in an insolvent bank the State's claim is to be preferred to that of the general depositors. But there is strong and well-reasoned authority to the contrary.

When we come to examine upon principle the question of to what extent, if any, has Virginia adopted, as applicable to debts due the Commonwealth, the rules of the common law of England relating to the prerogative right of the king to have the payments of his debts preferred, a comprehensive answer presents serious difficulties. It is even more difficult than in most of the other States, because of the fact that Virginia repealed that part of the ordinance of 1776 which adopted the English statutes enacted prior to 1607, one of which (33 Henry 8, c. 29, section 74) materially modified the common law on this subject. But this much is plain: The common law

---

[15] 51 A. L. R., pages 1355-1376, note dealing generally with State's prerogative right of preference at common law; 51 A. L. R., pages 1337-1350, note dealing with right of a State, in absence of statute, to preference in respect of public funds in an insolvent bank; 36 A. L. R. 640, note dealing generally with prerogative right of county or other political subdivision to preference in assets of insolvent; 29 L. R. A. note, 243 *et seq.; Fidelity & Deposit Co. of Md.* v. *Brucker* (Ind. Sup.), 183 N. E. 668. See, also, *Woodyard* v. *Sayre*, 90 W. Va. 295, 110 S. E. 689, 24 A. L. R. 1497, and *U. S. Fidelity & Guaranty Co.* v. *Central Trust Co.*, 95 W. Va. 458, 121 S. E. 430.

rules relating to the prerogative right of the king to have the payment of his debts preferred have not been lifted up bodily and incorporated into the law of Virginia without any modification other than to substitute the Commonwealth for the king, or crown. If they have been adopted to any extent, it is after they have been much "pared down" and restricted in their application.

From the early days of this Commonwealth it has been recognized that the ordinance of 1776 and the Virginia statutes above mentioned are not to be construed as having incorporated into our law, without modification, the whole body of the common law of England, except such parts of it as are, strictly speaking, repugnant to the Virginia Bill of Rights and Constitution, or as having made all parts thereof which are adopted applicable in Virginia to the same extent, or in the same manner in all respects, as it was applied by the English precedents.

In his opinion in *Baring* v. *Reeder,* 1 Hen. & M. (11 Va.) 154, 161, 162, Judge Roane remarks that, "I consider myself bound to pare down the governmental part of the common law of England to the standard of our free republican Constitution," and that "from the progressive and mutable state of the common law (even the law of *meum et tuum*) on some subjects, that law ought not to be received here, * * * in the same extent that it is admitted in England, the circumstances and character of which nation varying from ours, produces (imperceptibly perhaps) a correspondent variation in the rules of their common law."

In *Findlay* v. *Smith,* 6 Munf. (20 Va.) 134, 148, 8 Am. Dec. 733, Judge Roane says: "In considering what is waste, in this country, it is to be remarked, that the common law, by which it is regulated, adapts itself in this, as in other cases, to the varied situation and circumstances of the country."

In *Stout* v. *Jackson,* 2 Rand. (23 Va.) 132, 147, Judge Green says: "Although the general principles of the common law remain with us, yet their practical application is

varied according to the circumstances of the country, so that what is waste in England, is not, therefore, of course, waste here."

In speaking of the fact that under the common law of England the public in some cases had no right to navigate nontidal streams, because of grants to private persons made by the king, Brooke, J., says in *Stokes & Smith* v. *Upper Appomattox Co.*, 3 Leigh (30 Va.) 318, 336, 338: "The common law on the subject, as understood in England, *mixed up, as it is, with the prerogative of the crown,* is not to be so understood here. Its peculiar beauty is, that it adapts itself to the rights of parties, under every change of circumstances. *So far as it recognizes the prerogative* of the crown, it was abolished by the revolution; and, even where that is not the case, it is not always applicable to the same objects here, as in England." (Italics ours.)

In *Foster* v. *Com.*, 96 Va. 306, at page 310, 31 S. E. 503, 505, 42 L. R. A. 589, 70 Am. St. Rep. 846, Judge Riely, speaking for this court, says: "Such of its [the common law of England] doctrines and principles as are repugnant to the nature and character of our political system, or which the different and varied circumstances of our country render inapplicable to us, are either not in force here, or must be so modified in their application as to adapt them to our condition."

When we consider *only* debts due to the Commonwealth by taxpayers for taxes and other public dues, and debts due to it by its public collectors for public funds received by them, a strong argument can be presented to sustain the view that, as to such debts, Virginia did, *originally,* adopt (subject to certain limitations and restrictions which it is not pertinent here to discuss) the rule of the common law of England which gave the king a right to have *such* debts paid in preference to a debt due a private person. But there is also much to sustain the view that, if this be so, the statutes since enacted with reference to the collection of public debts have impliedly abrogated

the common law provisions giving the Commonwealth a preference for the collection of such debts, and limited the preferences to which it is entitled to those provided by statute. However, this case does not require a decision of these questions, and we leave them for decision when they are in issue.

■ But however this may be, we are of opinion that the rules of the common law of England relating to the king's prerogative right to have his debt preferred are not to be taken to have been adopted by Virginia as applicable to a debt which has arisen from, the Commonwealth having engaged in some commercial or business transaction with private persons or corporations, as, for instance, the deposit of its money in bank, the insurance of its property in an ordinary fire insurance company, or a contract for the construction of a road.[16] In such cases the State has descended to the level of the citizen and is to be deemed, in the absence of some statutory provision to the contrary, to have elected to take "pot luck" with its citizens.

■ In so far as the rule of English common law may be deemed to give the king a preference in the case of debts due him which have arisen from commercial or business transactions, it is so mixed up with the prerogative right of the king, which has no counterpart in our system of government, that it should not be deemed to have been adopted by the adoption by Virginia of the common law of England. The following cases from other jurisdictions support this view: *Fidelity & Deposit Co. v. Brucker* (Ind. Sup.), 183 N. E. 668; *Maryland Casualty Co.*

---

[16] We are not here discussing the right of the Commonwealth to be preferred, as between itself and others in interest, on a recovery had on an indemnifying bond taken by the Commonwealth for the protection of itself and others, as, for example, a bond taken from a highway contractor conditioned on the faithful performance of the work and also that the contractor will pay all debts incurred by him for labor and material. In *Fidelity & Casualty Co.* v. *Copenhaver, etc., Co.*, 159 Va. 126, 165 S. E. 528, the right of the Commonwealth to priority as between itself and the orders protected by such a bond is assumed without discussion. But the priority of the State in such cases involves principles other than those here under discussion.

v. *Rainwater, Bank Comm.*, 173 Ark. 103, 291 S. W. 1003, 51 A. L. R. 1332; *North Carolina Corp. Comm.* v. *Citizens' Bank & Trust Co.*, 193 N. C. 513, 137 S. E. 587, 51 A. L. R. 1350; *Fidelity & Casualty Co.* v. *Union Sav. Bank Co.*, 119 Ohio St. 124, 162 N. E. 420; *State* v. *Carlyon*, 166 Wash. 498, 7 P. (2d) 572; *Lake Worth Inlet Dist.* v. *First Amer. B. & T. Co.*, 97 Fla. 174, 120 So. 316; *Denny, Banking Com'r* v. *Thompson*, 236 Ky. 714, 33 S. W. (2d) 670, 673, 674; *Campion* v. *Village of Graceville*, 181 Minn. 446, 232 N. W. 917; *People* v. *Home State Bank*, 338 Ill. 179, 170 N. E. 205.

This conclusion efficiently disposes of the appellant's claim to a preference; but there are several other contentions of the appellant to which we shall briefly address our consideration.

In our rather extensive examination of the English precedents and authorities we have found no authority which even intimates that at the time of the American Revolution any political subdivision of the kingdom or body politic was regarded as being entitled under the common law of England to have its debts preferred. We are of opinion that, regardless of what may be rights of the State to a preference by virtue of the common law, a political subdivision or municipal corporation has no preference or priority by virtue of any provision of the common law. This is the generally accepted view of the court in this country. Though the following courts have held that, by the adoption of the common law of England, the State has succeeded to the prerogative right of the king to have his debts preferred, they hold that the prerogative right is the right of the State alone, and is not available to its political subdivisions: *County of Glynn* v. *Brunswick Terminal Co.*, 101 Ga. 244, 28 S. E. 604; *United States Fidelity & Guaranty Co.* v. *Rainey*, 120 Tenn. 357, 405, 113 S. W. 397, 409; *In re Northern Bank of New York*, 212 N. Y. 608, 106 N. E. 749; *Calhoun County Court* v. *Mathews*, 99 W. Va. 483, 129 S. E. 399, 52 A. L. R. 751 and note page 755; *Bignell* v. *Cummins*, 69 Mont. 294, 222 P. 797, 36 A. L. R. 634, and note page 640; *Board of Com'rs*

v. *People's Bank, etc., Co.*, 34 N. M. 166, 279 P. 60; *People* v. *Home State Bank*, 338 Ill. 179, 170 N. E. 205.

While there is no express statutory provision authorizing a county treasurer to deposit public funds in his hands in bank to his credit as treasurer, he commits no misfeasance or malfeasance and is guilty of no wrong in so doing, provided he has acted in good faith and with due care. It is not only permissible for him to do so, but under modern business conditions he should do so. *County of Mecklenburg* v. *Beales*, 111 Va. 691, 698, 69 S. E. 1032, 36 L. R. A. (N. S.) 285; *Aetna Cas., etc., Co.* v. *Board of Supervisors* (Va.), 168 S. E. 617, 631; *School Tp.* v. *Stevens*, 158 Iowa 119, 138 N. W. 927; *Kies* v. *Wilkinson*, 101 Wash. 340, 172 P. 351; *Phillips* v. *Yates Center Nat. Bank*, 98 Kan. 383, 158 P. 23, L. R. A. 1917A, 680; *State* v. *McFetridge*, 84 Wis. 473, 54 N. W. 1, 998, 20 L. R. A. 223. We do not construe section 362 of the Tax Code of Virginia, quoted in footnote 1, *ante*, as prohibiting or making it unlawful for a county treasurer to deposit public funds in his hands on general deposit with a bank. 26 R. C. L. 1315; *Schumacher* v. *Eastern Bank & Trust Co.* (C. C. A.), 52 F. (2d) 925; *Elston, Prince & McDade* v. *First State Bank*, 19 La. App. 385, 140 So. 510; *Moulton* v. *McLean*, 5 Colo. App. 454, 39 P. 78; *Allibone* v. *Ames*, 9 S. D. 74, 68 N. W. 165, 33 L. R. A. 585; *State* v. *Rubey*, 77 Mo. 610. On the contrary we think that Acts 1928, c. 507, section 50 (Michie's Code Va. 1930, section 4149 (49)), quoted in footnote 2, *ante*, impliedly recognizes his right to do so.

A county treasurer holds public funds upon a trust for the Commonwealth and/or the county. But trust funds may be deposited in bank on general deposit without committing a breach of trust; and the fact that the bank knows, or is charged with knowledge, that the fund is a trust fund does not make it a special deposit. We are of opinion, and so hold, that where public funds are deposited in bank by a county treasurer to his credit as such, without anything to establish it as a special deposit other than the bank's knowledge that the funds deposited

are public funds, the deposit is a general deposit, the bank becomes indebted to him just as it does to any other fiduciary who deposits fiduciary funds therein, and he is entitled to no priority of payment because of the public character of the funds. *People* v. *Home State Bank,* 338 Ill. 179, 170 N. E. 205; *Incorporated Town of Conway* v. *Conway,* 190 Iowa 563, 180 N. W. 677; *City of Aurora* v. *Bank of Aurora* (Mo. App.), 52 S. W. (2d) 496; *Kies* v. *Wilkinson,* 101 Wash. 340, 172 P. 351.

There may perhaps be cases in which the deposit of public funds in a bank by the Commonwealth or a county would be a violation of section 185 of the Constitution of Virginia (quoted in footnote 3, *ante*) where the deposit was made as a device to lend the credit of the Commonwealth or the county to the bank for the purpose of aiding the bank. But it is not properly to be construed to prohibit the Commonwealth or a county from making a general deposit of public funds in a bank in the usual course of business for its own convenience.

In the view which we have taken of the case, neither the Commonwealth, the county, nor the county treasurer was entitled to any preference to which the appellant could have been subrogated; and it is unnecessary to discuss this phase of the appellant's contention. But see the following Virginia and English cases which seem to support the appellant's contention that a surety who pays a debt due by his principal to the Commonwealth or county is entitled to be subrogated to all priorities or preferences to which the Commonwealth or county is entitled against the assets of his principal: *Enders* v. *Brune,* 4 Rand. (25 Va.) 438; *Leake* v. *Ferguson,* 2 Grat. (43 Va.) 419; *Robertson* v. *Trigg's Adm'r,* 32 Grat. (73 Va.) 76; *Manistry* v. *Churchill* (1888), 39 Ch. D. 174, 59 L. T. 597, 36 W. R. 805. In the last case cited the priority of the crown was based on its common law prerogative right, and the right of the surety to be subrogated thereto on a statute almost identical in its essential provisions with the

provisions of section 5777, Code Va. 1919, as amended by Laws 1926, c. 504.

For the reasons stated, we are of opinion that the court did not err in holding that the appellant was not entitled to be preferred to the general creditors of the bank, and that the decree appealed from should be affirmed.

*Affirmed.*

CHINN, J., absent.