## Richmond

ROBERT Y. BUTTON, ATTORNEY GENERAL OF VIRGINIA v.
SIDNEY C. DAY, JR., COMPTROLLER OF VIRGINIA.

January 15, 1968.

Record No. 6757.

` Present, All the Justices.

*Harry Frazier, III, Special Counsel (Robert Y. Button, Attorney General; R. D. McIlwaine, III, First Assistant Attorney General; Conrad M. Shumadine; Hunton, Williams, Gay, Powell & Gibson, on brief), for petitioner.*

*William C. Worthington (Robert W. Stewart, on brief), for respondent.*

CARRICO, J., delivered the opinion of the court.

In this original petition for a writ of mandamus, we are called upon

to decide the constitutionality of the Virginia Industrial Building Authority Act, enacted by the General Assembly at its 1966 session. (Acts of 1966, Chapter 689, p. 1172; Code, §§ 2.1-64.4 to 2.1-64.14.) The Act created the Virginia Industrial Building Authority with certain public and corporate powers specified therein.

The legislature appropriated to the Authority the sum of $2500 to defray miscellaneous expenses. The Comptroller of Virginia expressed doubt as to the constitutionality of the Act and stated that he would "refuse to honor vouchers from the Authority . . . until there has been a final adjudication by the Supreme Court of Appeals of Virginia" of the constitutional questions raised by him. This petition for mandamus followed. (Code, § 8-714.)

Code, § 2.1-64.5 states that because of critical unemployment problems in the State, there exists a need to stimulate and promote the economy of the Commonwealth by encouraging and assisting the location of new industries and the rehabilitation and expansion of existing industries throughout the Commonwealth. The Code section further recites that because of the inability of financial institutions to provide sufficient funds to finance desirable industrial projects, there exists a need to stimulate a larger flow of private investment funds from banks, insurance companies, and other financial institutions and sources into industrial projects in the State. The Act was adopted, therefore, the Code section concludes, "to encourage the making of loans for the purposes of furthering industrial expansion . . . and thereby promoting employment and improving" the general welfare of the inhabitants of the Commonwealth. Such purposes are declared to be "public purposes for which public funds may be spent."

Code, § 2.1-64.7 creates the Authority as a political subdivision of the Commonwealth and states that in the exercise of the powers conferred upon it, the Authority shall be deemed and held to be performing essential governmental functions. The Code section further provides that the Authority shall be composed of seven members, including the State Treasurer, the Director of the State Division of Industrial Development and Planning, and five persons to be appointed by the Governor, subject to confirmation by the General Assembly.

Under Code, § 2.1-64.8, the Authority is authorized and empowered, among other things necessary to carry out the purposes of the Act, to acquire, purchase, manage, operate, hold, and dispose of

real and personal property; to accept gifts, loans, and grants for any of its purposes; and to do all things necessary to safeguard the loan guaranty fund. And, most crucially, the Authority is empowered *to guarantee loans for industrial projects.*

By Code, § 2.1-64.12, there is established a loan guaranty fund "to be known as the Virginia Industrial Building Guaranty Fund and to be used as a revolving fund for carrying out the purposes of this chapter." The Code section provides that there shall be deposited into the guaranty fund all receipts of the Authority, *including appropriations made by the Commonwealth.* Against the fund, there shall be charged all expenses of the Authority, including operating expenses, and payments of principal, interest, and other charges in connection with a guaranteed loan which is in default.

Code, §§ 2.1-64.9, 2.1-64.10, and 2.1-64.11 prescribe the method by which a loan shall be guaranteed by the Authority. An industrial firm must make application in writing after it has secured a firm commitment for the loan sought to be guaranteed, such commitment to be for an amount equal to the full cost of the project, and has made adequate provision to obtain all machinery and equipment necessary to operate the project. The Authority then must hold such hearings or make such examination as it deems necessary to determine whether the public purposes of the Act will be accomplished by the guaranty. Upon such determination, the Authority may, under certain prescribed conditions, contract "to guarantee a loan not in excess of forty per centum of the cost of the industrial project."

It is expressly provided that the Authority shall have no power to make direct loans for any industrial project.

The maker of each guaranteed loan is to be charged an annual premium by the Authority. The premium shall be not less than one-half percent and not more than two percent of the principal obligation outstanding on the anniversary date of the loan.

Code, § 2.1-64.13 provides that loan guaranties made under the provisions of the Act shall not be deemed to constitute a debt or a pledge of the faith or the credit of the Commonwealth or of any political subdivision thereof but shall be payable solely from the loan guaranty fund. All documents evidencing the guaranty of loans shall contain such a disclamatory statement.

Although the Comptroller has raised a number of constitutional objections to the Act, counsel for the litigants agree, and with their view we concur, that the crux of the case is the proper application of

the credit clause contained in § 185 of the Constitution of Virginia, which provides that "[n]either the credit of the State, nor of any county, city or town, shall be, directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporation."

The question for decision, then, is whether the appropriation by the legislature of funds to the guaranty fund, pursuant to Code, § 2.1-64.12, combined with the guaranty by the Authority of loans for industrial projects based upon the strength of the guaranty fund, under the provisions of Code, § 2.1-64.8, constitutes a granting of the credit of the State to or in aid of any person, association, or corporation, in violation of § 185.

The Attorney General contends that the Act is free of credit-clause unconstitutionality because the animating purpose thereof is to stimulate the development and growth of industry, thus reducing unemployment and lessening the financial burden upon the State of public assistance and unemployment compensation programs. Such a purpose, the Attorney General argues, is public in nature, its performance constituting a proper governmental function inuring dominantly to the benefit of the State, with the benefit to any private interest being merely incidental. Under such circumstances, the Attorney General says, this court has not hesitated to hold that there has been no violation of the credit clause of § 185.

The Comptroller, on the other hand, while conceding that our prior decisions have established that stimulation of the development and growth of industry by the State is constitutionally permissible, contends that the avowed object of the Act is to enable private industrial projects to obtain credit upon the faith of State funds where ordinary sources have proven inadequate. Such a method of aiding industry, the Comptroller says, is forbidden by the credit clause of § 185 of the Constitution.

This court has frequently had occasion to interpret and apply the credit clause of § 185. Only one case, however, has involved the undertaking of a guaranty by one of the political subdivisions of the State. That was the case of *Holston Corp.* v. *Wise County*, 131 Va. 142, 109 S. E. 180.

In the *Holston* case, Wise County had embarked upon a program of road construction financed by the proceeds of a $1,000,000 bond issue. Before advertising for bids from road building contractors for the performance of the work, the county entered into a contract

with a producer of limestone material to supply crushed stone at a special price to any and all contractors to whom the work might be let. In return, the county agreed to guarantee to the producer payment for the stone.

We held that the county's contract with the producer did not violate the credit clause because, in insuring a supply of stone at a fixed price for the performance of the road work, the county was acting for its sole benefit, and not for or in aid of another. It was clearly indicated, however, that the result would have been different if the object of the contract had been to enable any of the road contractors *"to obtain the stone on the credit of the county, when upon their own credit they could not have obtained it."* [Emphasis added.] 131 Va., at 157, 109 S. E., at 184.

In a number of cases, we have dealt with the application of the credit clause to transactions where, as here, the use of public funds was involved and the claim was made that there was an unconstitutional granting of the credit of the State or one of its political subdivisions.

In *U. S. Fidelity Co. v. Carter*, 161 Va. 381, 170 S. E. 764, we held that the deposit by a county of tax funds in a local bank was not violative of the credit clause where the deposit was in the usual course of business, for the county's convenience, and not as a device to lend the credit of the county to the bank for the purpose of aiding the latter.

In *Almond v. Day*, 197 Va. 782, 91 S. E. 2d 660, we held the credit clause not to be violated by the investment in approved corporate securities of funds in the Virginia Supplemental Retirement System, stating that "[u]se of the State's funds for purchase of securities for the State's benefit is not an extension of 'credit' which poses any threat to the financial security or welfare of the State." 197 Va., at 791, 91 S. E. 2d, at 667.

In *Harrison v. Day*, 200 Va. 750, 107 S. E. 2d 585, this court held that there was no violation of the credit clause involved in a loan from the Produce Market Loan Fund, a fund created by act of the General Assembly, to the Richmond Produce Market Authority, a political subdivision of the Commonwealth, for the purpose of establishing and operating a produce market for the buying, selling, and handling of perishable farm produce so as to promote the agricultural and industrial development of the State.

. In *Harrison v. Day*, 202 Va. 967, 121 S. E. 2d 615, the Virginia

State Ports Authority was authorized to acquire, construct, and operate port facilities, financing such work by the sale of bonds payable solely from the revenues derived from the project. The port authority was also empowered to lease its facilities upon such terms as it should determine.

The port authority proposed to construct port facilities in Hampton Roads and to enter into a lease agreement with the Norfolk and Western Railway Company whereby the latter would operate the project as general cargo port terminal facilities, for use by the general public, at a rental sufficient to amortize the port authority's bonds. In the lease agreement, the port authority obligated itself to "urgently request" the General Assembly, at each subsequent session, to appropriate an amount equal to 50 percent of the annual rent installments which would be applied to the payment of the revenue bonds and would, in turn, reduce the rent due from the railway, if not then in default.

We pointed out that both the act creating the authority and the lease agreement provided that the State was in no way obligated to make any future appropriations on behalf of the project; that any contributions made by the State would be for a public purpose; and that the railway was, in any event, bound to pay a rental sufficient to discharge the revenue bonds. Under these circumstances, we held that there was no pledge of the State's credit in violation of § 185.

To like effect was the holding in *Button* v. *Day*, 205 Va. 629, 139 S. E. 2d 91, involving port facilities at Newport News, where the enabling act creating the Peninsula Ports Authority of Virginia authorized the authority to pledge to the payment of its revenue bonds money from "time to time" appropriated to the authority by the General Assembly and the city of Newport News. A tripartite agreement between the city, the authority, and the Chesapeake & Ohio Railway Company, which was to lease and operate the facilities, provided that the authority would "urgently request" the General Assembly to appropriate an amount equal to 50 percent of the annual amortization of the authority's bonds; but, in the absence of such appropriations, the city would pay such amount.

Although we found that the tripartite agreement exceeded, in certain respects, the powers granted in the enabling act, we held that since appropriations by the State and city to the authority would be for the governmental objectives of the authority and since the latter's undertaking to "urgently request" the General Assembly to appro-

priate funds was a "moral obligation only, whereas Section 185 deals with legal obligations," there was no violation of the credit clause.

In *Development Authority* v. *Coyner*, 207 Va. 351, 150 S. E. 2d 87, the board of supervisors of Fairfax County appropriated $10,000 to the Fairfax County Industrial Development Authority, pursuant to an act creating the authority as a political subdivision of the State and authorizing the county "to make appropriations and provide funds for the operation of the Authority." The authority proposed to issue its revenue bonds and from the proceeds thereof to repay the $10,000 appropriated by the county and to construct an industrial plant for lease to a private firm.

We held that the stimulation and promotion of industrial development was for a public purpose and thus a proper function of government. We upheld the appropriation by the county, stating that even if the proposed bonds were not issued and the money repaid by the authority, the appropriation was for a public purpose and no tax funds would have been used for a non-governmental purpose. We also said that in the issuance of bonds by the authority, neither the State nor the county granted its credit or became liable in any manner because the holders of the bonds were to look for payment only to the fund created from rentals of authority property. Hence, there was no violation of the credit clause, even though some private interest might incidentally benefit from the transaction.

Finally, in *Chesapeake Devel. Authority* v. *Suthers*, 208 Va. 51, 155 S. E. 2d 326, the Industrial Development Authority of the City of Chesapeake had been created by city ordinance as a political subdivision of the Commonwealth, pursuant to authority conferred upon the city by the General Assembly. The authority proposed to issue revenue bonds and from the proceeds of the sale thereof to construct an industrial plant to be leased to a private firm.

Although there was no State or local appropriation involved in the *Suthers* case, the claim was made that the bonds to be issued by the authority would be in reality the bonds of the city, constituting an unlawful granting of the city's credit to or in aid of the private firm which was to lease the industrial plant. We rejected the claim, stating that the authority was not a "device or pretense" created to evade the credit clause of § 185. We pointed out that the bonds would be solely the debt of the authority, payable only from the fund made up of revenues and receipts to be derived from the lease or sale by the authority of its properties.

The foregoing cases were decided, just as this case must be decided, against the backdrop of the historical influences which led to the adoption of the credit clause in the first place.

The forerunner of the present credit clause of § 185 was added to our Constitution in 1869, as § 12, Article X. It read:

"The credit of the State shall not be granted to or in aid of any person, association, or corporation."

The present all-encompassing language of the credit clause was added by the Constitutional Convention of 1902, prohibiting the granting of the credit of the State and of any county, city, or town "directly or indirectly, under any device or pretense whatsoever . . . to or in aid of any person, association, or corporation."

The credit clause, together with the predecessors of the present stock and obligations and internal improvement clauses of § 185, was incorporated into the Constitution to correct the evils existing in the nineteenth century resulting from the State's over-active participation in the promotion of privately owned transportation facilities. The extent and the effect of the State's participation in such activities are summarized in *Almond* v. *Day, supra*, 197 Va., at 787-788, 91 S. E. 2d, at 664-665, as follows:

". . . In 1816, the General Assembly created 'The Fund for Internal Improvement,' and incorporated a 'Board of Public Works' to administer the fund. Acts 1816, ch. 17, p. 35. Subsequent acts of the General Assembly show that through this Board large sums of money were loaned or advanced by Virginia to various corporations engaged in developing and operating privately owned works of internal improvements, such as canal, turnpike and railroad companies, that held promise of public benefit. Financial obligations in vast sums were incurred by the State, and its credit was freely but often unwisely extended to foster these enterprises by purchase of their bonds and stock, *or through guarantee of their obligations and indebtedness.* This was done with the hope and expectation that the enterprises would thrive and bring to the areas served business prosperity and to the State at large public benefit." [Emphasis added.]

"The magnitude of the obligations incurred by the State, and the amount of money lost by lending its credit and financial aid

to such enterprises may be ascertained from an historic report of J. D. Imboden, entitled 'Early History of Transportation in Virginia' in Vol. 17, page 5, House Executive Documents, 2nd Session, 49th Congress, 1886-87. At page 75 of this report it is stated that the State's railroad losses, which included its losses incident to the James River and Kanawha Canal, amounted to over $26,000,-000. . . ."

*Almond* v. *Day, supra,* involved the application not only of the credit clause but as well the stock and obligations and internal improvement clauses of § 185. After making the just-quoted historical analysis, Mr. Justice Miller, writing for the court, succinctly described the impelling necessity and commanding purpose for the adoption of the three clauses, as follows:

"The provision forbidding the State to 'become a party to or become interested in any work of internal improvement,' as well as the 'credit' and the 'stock or obligations' clauses was inserted in the basic law to remedy the same evil, and the three clauses were adopted to meet the same long existing threat and danger, namely, *the use of the State's funds and credit to foster and encourage construction and operation of private enterprises.*" 197 Va., at 793, 91 S. E. 2d, at 668. [Emphasis added.]

[1] Aided by the historical considerations prompting the adoption of the credit clause and guided by the force of our precedents, we reach the conclusion that the Act before us should not be accorded the judicial approbation sought for it. We arrive at that conclusion not unmindful of the established principle that every reasonable doubt should be resolved in favor of an act of the legislature. Nor are we unheedful of our self-expressed admonition that only where such an act plainly exceeds constitutional limitations, should the court strike it down. *Harrison* v. *Day, supra,* 202 Va., at 973, 121 S. E. 2d, at 619; *Almond* v. *Day,* 199 Va. 1, 6, 97 S. E. 2d 824, 828. But, reluctant though we might be to disagree with a cognate branch of government, if legislative action crosses the line delimited by the Constitution, it is our duty to declare its invalidity. *Moore* v. *Sutton,* 185 Va. 481, 484, 39 S. E. 2d 348, 349.

It must be conceded that, just as the Attorney General says, the Act states that the Authority would be performing essential governmental functions in exercising its powers; that the Act further states

that loan guaranties undertaken by the Authority shall not be deemed to constitute a debt or a pledge of the faith or the credit of the Commonwealth or of any political subdivision thereof, but shall be payable solely from the guaranty fund; and that, under the Act, the legislature, once it establishes the guaranty fund by a so-called "one shot" appropriation, is under no obligation to make additional appropriations to the fund.

[2] It is also true, as the Attorney General asserts, that in some of our previous cases, the "special fund" doctrine has been applied to insulate legislative financing plans against constitutional attack. And, admittedly, we have said that if the animating purpose of a transaction and the object it is designed to accomplish are for the State's benefit, there is no lending of the State's credit, even though private interests might incidentally benefit.

But the Constitution is supreme, taking precedence over statutory provisions in conflict therewith. What the Constitution says shall not be done, cannot be done. If the Constitution says something is not a proper governmental function, no amount of legislative language can make it so. And where, as here, the basic law prohibits indirect, as well as direct, action affecting the State's credit, we must look to the four corners of the legislation in question to see what is the real use to which State funds are to be put, bearing in mind, of course, the statement in the statute that a pledge of credit is not intended.

It cannot be gainsaid that stimulation of the development of industry is a public purpose warranting governmental participation to achieve the desired objective of creating additional employment for the citizens of the State. It does not follow, however, that because the goal is meritorious, every method which might, in some way, aid its accomplishment is therefore constitutionally permissible; or, to put it another way, that because the purpose is public, anything done in furtherance thereof becomes, *a fortiori*, a proper governmental function.

The Act before us is stamped indelibly with the purpose of granting credit in aid of private interests upon the faith of State funds—the precise thing the Constitution says shall not be a proper function of government. Granting credit with State funds is the sole, quickening function of the Authority, the very core of its existence. To withhold the use of State funds or to withdraw the power to grant credit would unavoidably bring about the early demise of the whole scheme.

We have noted with interest and given attention to the Attorney

General's argument that there is no extension of credit involved in a "one shot" appropriation of cash unattended by an obligation to appropriate further funds. In a proper case, that might be a valid argument. We know here, however, that any money that is appropriated by the legislature to the guaranty fund, whether initially or in subsequent appropriation acts, is to be used, by the express terms of the Act, for nothing but the granting of credit, and that simply is constitutionally impermissible.

We have given long and serious consideration to the Attorney General's earnest insistence that the "special fund" doctrine affords protection to the Act from the Comptroller's objections. But in no prior case where we have applied the "special fund" doctrine to uphold a financing plan against a credit-clause attack has there existed the fact, present here, of State funds being set aside and held for the sole purpose of guaranteeing future payment of defaulted loans of private debtors. And in no such previous instance has there been lacking the fact, missing here, of public ownership of the facilities upon which public funds were to be expended, such ownership to continue at least as long as there remained outstanding any revenue bonds sold to finance construction or improvement of the facilities. These crucial distinctions prevent the application of the "special fund" doctrine to save the situation before us.

We have not overlooked our rule that, in determining whether there has been a violation of the credit clause, we look to the animating purpose of a public transaction to see if it is for the dominant benefit of the State. But unlike any other case which we have had before us, there is inherent in the operation of the Authority and to the use of the guaranty fund the fact, expressed in the Act, that the debts to be guaranteed by the Authority and to be discharged with State money from the guaranty fund upon default, are otherwise unobtainable loans secured from private sources by private firms to finance construction or improvement of privately owned industrial plants. In such a situation, it is difficult, if not well-nigh impossible, to say that the benefit to private interests is merely incidental or, conversely, that the benefit to the State is paramount.

We revert to the cautionary language of *Holston Corp.* v. *Wise County, supra,* 131 Va., at 157, 109 S. E., at 184, forewarning that a public transaction would be subject to constitutional attack if its object is to enable private interests to obtain upon public credit that which "upon their own credit they could not have obtained."

Here, the avowed objective of the Act and the intended result to be achieved by the functioning of the Authority is to enable private firms to obtain loans upon the strength of the publicly underwritten credit of a political subdivision of the State when upon their own credit such firms cannot obtain the same loans for themselves. This compels the holding that to the extent that State funds are employed in the process, there is necessarily involved the indirect granting of the credit of the State in aid of a person, association, or corporation in violation of § 185 of the Constitution.

[3] Before concluding, we must note that the Act before us was adopted at the 1966 session of the General Assembly. At that same session, there was proposed, agreed to, and referred to the next session of the Assembly for its concurrence, an amendment to § 185 of the Constitution, to be added at the end of the present section, and to be worded as follows:

"This section shall not be construed to prohibit the General Assembly from establishing an authority with power to insure and guarantee loans secured by first deed of trust or first mortgage on privately owned industrial plants to finance industrial development and industrial expansion, and from making appropriations to such authority to enable it to exercise such power." [Acts of 1966, Chapter 726, p. 1583.]

If the use of State funds to insure and guarantee loans on privately owned industrial plants for the purpose of stimulating industrial development is to become a function of government in this Commonwealth, a proper approach has now been undertaken to achieve that end.

The writ of mandamus will be denied.

*Mandamus denied.*

SNEAD and HARRISON, JJ., dissenting.

We find ourselves in disagreement with the decision of the majority. In essence the opinion holds that the Virginia Industrial Building Authority Act (Acts of 1966, Chapter 689, Page 1172) is unconstitutional because it violates the credit clause of § 185 of the Constitution of Virginia. In light of our prior decisions interpreting the credit clause, we can see no constitutional barriers to the provisions of the Act. Accordingly, we would grant the writ of mandamus.