## CIRCUIT COURT OF THE CITY OF RICHMOND

Commonwealth of Virginia

v.

Dare To Be Great, Inc.,
Glenn W. Turner,
Armand R. Fredette

June 30, 1971

Case No. B-2990

By JUDGE JOHN WINGO KNOWLES

This case, you will recall, is before the Court upon the plaintiff's "Petition for Temporary and Permanent Injunction and Restoration of Monies"; upon proof of service of process upon the statutory agents for the non-resident defendants, Dare To Be Great, Inc., and Glenn W. Turner, and of service by posting upon the defendant, Armand R. Fredette; upon the evidence adduced and argument of counsel at the initial hearing on September 30, 1970; upon the order entered on October 9, 1970, awarding a temporary injunction effective on October 2, 1970; upon the demurrers filed on behalf of the defendants; upon the testimony of Clyde C. Cobb offered by the defendants on December 11, 1970, and upon final argument of counsel supplemented by their subsequent memoranda of law.

At the initial hearing the Commonwealth presented the testimony of three witnesses, Marvin Harold Morgan, an investigator for the Prince William County Police Department; Douglas Howard Robertson, an insurance agent from Danville and Mack A. Gallimore, a resident of Riner,

Virginia, who is employed by Corning Glass Works. Since the testimony of these three men was the basis upon which the Court entered the temporary injunction, the story of each is presented here in narrative.

The witness Morgan testified that on August 15, 1970, the Attorney for the Commonwealth for the County of Prince William directed him to attend a meeting at the Three Chefs' Restaurant, Roscoe Plaza, Woodbridge, Virginia, the announcement of which meeting having been contained in a newspaper advertisement. At the meeting the defendants Glenn Turner and Armand Fredette were "guest speakers" on behalf of the defendant corporation and they, as well as others whose names the witness did not recall, explained the type of "motivation courses" available and told those present how income could be derived from joining their organization.

The "areas" in which those who joined earned income were those wherein one was classified as holding the position or description of "manager" and of "franchise administrator." Only one of these two individuals could sell the basic "courses" designated as "adventure I" and "Adventure II."

Mr. Morgan recalled that he heard the speakers explain that a "student" who enrolled in "Adventure I" would receive "motivation type tapes," written materials and a tape recorder-player and be entitled to attend two day seminars. The cost of this course was $300.00. The "Adventure II" course was priced at $400.00, and the student received the "Adventure I" materials, if he had not completed that course, plus twelve new tapes and the privilege of attending additional seminars.

To become a "manager" the total cost was to be $2,000. This included the $300 for "Adventure I," $400 for "Adventure II" and $1,300 in addition upon completion of "Adventure I" and while completing "Adventure II" or thereafter. As soon as a "student" became a "manager" he was eligible to earn commissions on sales of "Adventure I" and "Adventure II" to others. A student enrolled in "Adventure I" entitled the "manager" to a $100 commission, an "Adventure II" enrollee yielded a $200 commission, and if a "manager" signed up another "manager," he earned a $500 commission.

The final step open to a participant was to become a "franchise administrator." In explaining this program a blackboard demonstration was put on and Mr. Morgan

learned that if a "franchise administrator" brought in five "managers," he would receive commissions of $900 for each "manager" enrolled, if the five were signed up in thirty days. Further, if the "franchise administrator" worked with them and acquired five more managers in another thirty days, he would get another $4,500 in commissions. If, in another thirty-day period he brought in ten more "managers," these would be at $400 each and the "franchise administrator" would have earned another $4,000. By working carefully with these last ten individuals and having another ten managers enrolled in a fourth thirty-day period, the successful "administrator" would have earned $18,500 in all in one hundred twenty days.

Later, on August 27, 1970, this witness talked to Armand Fredette, who identified himself as "State Director" of Dare To Be Great Incorporated. Mr. Fredette told him that the commissions called for in the programs would be forthcoming from the corporation and when Mr. Morgan asked what would be done with his check when he signed up, Mr. Fredette replied that he would receive the commission for signing him.

Mr. Douglas H. Robertson first became aware of the defendant corporation when one of the men in one of the units of the Virginia National Guard, which Mr. Robertson instructs, told him, in about November, 1969, that an organization was being formed to provide a "motivation course" and that instructors were needed. Later, Boyd W. Adkerson, Jr., explained the program to him and said that he, Adkerson, was a "Success Engineer" with the corporation.

On April 20, 1970, Mr. Adkerson came to Mr. Robertson's office with the "contract" which was admitted as Commonwealth's Exhibit No. 1 and Robertson was duly enrolled in "Adventure I" upon payment by him of $300. The witness testified that he could then sell the "Adventure I" course and would get a commission upon his sale of that class of course only. At that same time he "knew that he could move up to "Success Engineer" by payment of an additional sum of money. If he did pay as required and duly became a "Success Engineer," Mr. Robertson asserted that he would then have to sell one "Adventure I" course at $300 and the commission on that first sale would go to Adkerson, thereafter he, Robertson, would be entitled to all earned commissions.

On June 29, 1970, Mr. Robertson paid $1,200 to the corporation "in order to move up" and become a "Success Engineer." Then, on or about August 1, 1970, he received the publication admitted as Commonwealth Exhibit No. 2 from which he learned that thenceforward "Success Engineers" would be called "Administrators."

The last witness presented on September 30, 1970, Mr. Mack A. Gallimore, had first heard of Dare To Be Great, Inc., in the middle of July, 1970. His wife had attended a "gospel singing" and while there had been invited by a man called Monroe Hopper to attend a promotional meeting. Mrs. Gallimore went to the meeting and told her husband what had transpired.

After this meeting Monroe Hopper had called twice to invite Mr. Gallimore to these meetings and one evening Monroe Hopper and Wayne Hopper called on Mr. Gallimore. Wayne Hopper identified himself "as some official" of Dare To Be Great, and said that he was a "State Administrator" the same as "French Fredette," each handling a different part of the State. After the Hoppers explained the set-up to Mr. Gallimore, he borrowed the materials, saying that he "would think it over." On the next day they came out and enrolled him in "Adventure I," for which Gallimore paid $300.

The witness described the materials received in "Adventure I," which he called "a motivation course--how and when to sell--to do things." The items mentioned included a brief case, a tape recorder, twelve tapes, a notebook with twelve sets of written materials and a two-day seminar. The seminar, to which wives and teenage children of "students" are invited, was to be held in Christiansburg.

Next, Mr. Gallimore enrolled in "Adventure II." This entitled him to twelve more tapes, twelve more written "materials" and twelve two-day seminars. According to him he had not yet "had" the "Adventure I" and "II" seminars up to the time he testified, although he had attended a one-day meeting in Martinsville because he thought it might help him out.

On July 29, 1970, Mr. Gallimore gave to Monroe Hopper his check payable to Dare To Be Great, Inc., in the amount of $1,500 and was enrolled as a "success engineer." He was told that he had to replace himself in "Adventure I," but Mr. Hopper said "he had a man in Harrisonburg he would let me have and I would get the $100 commis-

sion." Then, about August 1, 1970, all "success engineers" were moved up to "administrators."

With reference to what he had in mind as to possible success with his new association, Mr. Gallimore testified that he had been told of "some boy in Cleveland, nineteen years old," who had made $50,000 in one month. In addition, Monroe Hopper supplied him with the "figures" shown on the two sheets admitted as Commonwealth's Exhibit No. 4.

As an administrator he was trained at a one and one-half day session in September, 1970, by one man from the home office. In addition, this witness was told he "could go to Florida" to the home office. In his "job" as "franchise administrator" Mr. Gallimore explained that he could sell and distribute the courses, Adventure I and Adventure II, and the "manager's" position. He is eligible to receive the commissions on these at the rates of $100, $200 and $900, respectively, and is also permitted to enroll "franchise administrators" at $5,000 for which he receives a commission of $2,500.

In the opinion of Gallimore both "Adventure I" and "Adventure II" are "good courses." He feels, and so testified, that so far as he is concerned, the tapes, books and philosophy are good.

Chapter 450, Acts of Assembly, 1970, bears the title:

> An Act to amend the Code of Virginia by adding in Chapter 4 of Title 59.1 sections numbered 59.1-67.1, 59.1-67.2, and 59.1-67.3, relating to pyramid promotional schemes; the same to be unlawful; penalties for violation; contracts void; injunctions.

The purpose set out in the title is clearly to protect the public from the effect of the basic principle involved that growth cannot be perpetual. The limits are circumscribed by time, distance, willing or unwilling prospects and population where the reward achieved and the success of the program depend upon an increasing number of "students" produced by solicitation of participants.

The two principal Code Sections 59.1-67.1 and 59.1-67.2 announce the "public policy" of the Commonwealth to proscribe the operation or promotion of "any program utilizing a pyramid or chain process by which a participant gives a valuable consideration for the opportunity to receive compensation or things of value in return for

inducing other persons to become participants in the program." [§ 59.1-67.1(a)], and declare that "all contracts and agreements, . . . whereof the whole or any part of the consideration is given for the . right to participate in pyramid promotional scheme programs, are against public policy, void and unenforceable." [§ 59.1-67.2]

Definitions of the words "compensation" and "promotes" are contained in § 59.1-67.1 in subparagraphs "(b)" and "(c)" and serve to clarify and render more precise the language of that section. The first is defined in the negative, which, though unusual in legislation, does not render its meaning any more obscure or vague:

> (b) *"Compensation"* does not mean payment based on sales of goods or services to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme;

The second merely limits the verb "promote" to a single meaning in the context of the statute, as follows:

> (c) *"Promotes"* shall mean inducing one or more other persons to become a participant.

The Court finds that the undisputed evidence offered on behalf of the plaintiff Commonwealth dictates the conclusion that the "program" as explained by the witnesses and spelled out in Commonwealth's Exhibits Nos. 1, 2 and 4 is in fact a "pyramid promotional scheme" as defined in § 59.1-67.1 of the Code of Virginia so long as commissions are offered to participants for inducing others to become participants in the manner described at the hearing on September 30, 1970. The defendants have sought to adduce evidence in support of their demurrers which, if considered in the case, would have the effect of creating an entirely new factual situation, that of the last week in November or first week in December, 1970, [Transcript, December 11, 1970, p. 60], in the place of that alleged in the petition. As the Court indicated at the December 11, 1970, session, to permit the introduction of this later evidence would be to allow "speaking demurrers." The objection of the Assistant Attorney General to the introduction of this evidence is sustained.

The issues remaining are those raised by the demurrers, whether Chapters 450 and 780, Acts of Assembly, 1970, are constitutional under the State and federal constitutions. If Chapter 450, which is codified as Sections 59.1-67.1, 59.1-67.2 and 59.1-67.3, is determined to be constitutionally unsound, there is no necessity to consider Chapter 780, which is codified as Section 59.1-68.2. The defendants assert that these two Acts violate and conflict with Sections 1, 8, 10, 11, 52 and 63 of the Constitution of Virginia and the Commerce Clause (Section VIII, Article I); Prohibition against Impairment of the Obligation of Contracts (Section X, Article I) and Amendments IV, V, VI and XIV of the Constitution of the United States of America.

The argument of the defendants is based principally upon the contentions that §§ 59.1-67.1 and 59.1-67.2 are too vague and indefinite to be constitutional, in that they fail to set any standards, guide lines or limits which the average citizen could use to determine what he can or cannot do without running afoul of the Statute, and that these two sections of the Code, when read together with §§ 59.1-67.3 and 59.1-67.2, result in impairment by the Commonwealth of the obligation of all existing contracts which fall within the area proscribed by the legislation.

Necessarily, under our system of government, all Acts of Assembly are presumed to be constitutional. *John Doe* v. *Brown*, 203 Va. 508, 514 (1962); *Kingan, Inc.* v. *City of Richmond*, 198 Va. 820 (1957); *Good* v. *Commonwealth*, 155 Va. 996, 1000 (1930). Further, every reasonable doubt should be resolved in favor of a statute and a court should strike it down only where it plainly exceeds constitutional limitations. *Button* v. *Day*, 208 Va. 494, 502 (1968); *Harrison* v. *Day*, 202 Va. 967, 973 (1961).

As the Assistant Attorney General pointed out on pages 4 and 5 of his reply brief, it is axiomatic that a statute which creates a statutory offense must convey to a person of ordinary intelligence the definition of the offense by specifying, with reasonable certainty, the act or acts commanded or prohibited thereby. *Caldwell* v. *Commonwealth*, 198 Va. 454, 458 (1956). The language of this definition or description of the conduct proscribed by Section 59.1-67.1 is sufficiently clear to be understood by the "average citizen or businessman" referred to on page 29 of the defendants' brief.

Any dictionary will give the reader meanings for each of the words in the first sentence of the Code Section in point. Further, the General Assembly was careful to explain what it meant by "pyramid promotional scheme" and "promotes" in order to clear up any possible vagueness or ambiguity. That body went on to explain in subparagraph "(b)" that the prohibition was limited to those participating by joining in the scheme in order to take advantage of the referral sale aspect of any such program.

In effect, so long as the "scheme" or "program" is based upon the sale of goods or services to individuals who are not "participants" by agreement, express or implied, and "are not purchasing in order to participate in the scheme," i.e., in order to become eligible themselves to sell the goods or services to others and in return therefor be paid a commission, there is no violation. Conversely, if one is induced to buy a product or service and a part of his purchase is the right to sell the same products or services to others, or induce others by buy, and then he receives commissions on such sales, the chain "process" is initiated and the law of diminishing returns begins to operate against the interests of those who come in as participants late in the game.

Section 59.1-67.2 announces that this type of activity is against the public policy of this Commonwealth. The Court finds that Chapter 450, Acts of Assembly, 1970, satisfies the requirement of certainty and definiteness in its specification of the conduct prohibited and does not violate the Due Process clauses of the XIV Amendment to the Constitution of the United States of America and of Article I, § 8, of the Constitution of Virginia [Article I, § 11, new Constitution]. It is a valid exercise of the police power of the Commonwealth in that the sovereign has a vital interest in the protection of its citizens from fraud and, in fact, from the consequences of their own ignorance or folly in not recognizing that sooner or later, usually sooner, the market will become saturated and no one interested in purchasing the product or service proffered will remain. *Reaves* v. *Commonwealth*, 141 Va. 194, 204 (1925).

The New York and Florida vacuum cleaner and sewing machine cases cited by the Assistant Attorney General (*State by Lefkowitz* v. *ITM, Inc.*, 275 N.Y.S.2d 303 (1966), *Lippincott Mortgage Investment Co.* v. *Childress*, 204 So.2d 919 (Fla. App. 1967), and *Florida Discount Centers,*

*Inc.* v. *Antinori,* 226 So.2d 693 (Fla. App. 1969)), all of which involve statutes similar in principle to those in question here and "schemes" or "programs" strikingly akin to the Dare To Be Great offerings, are most persuasive to this Court. In point of fact, one is hard put to differentiate between the situation here as related by the witnesses on September 30, 1970, and the situations in those cases.

The final major ground of argument by the defendants is their contention that § 59.1-67.2 impairs the obligation of contracts in violation of Section 10, Article I, of the Constitution of the United States of America. "The prohibition of the federal constitution is upon the state, without regard to the form its laws may take or the agencies which enact them." 4 M.J., *Constitutional Law,* § 102 (p. 197).

There is a well recognized exception, however, which is succinctly expressed in the following section, § 103, to that quoted above. The exception arises by virtue of the rule that "in every sovereign community there inheres necessarily the right and duty of guarding its own existence, and of protecting and promoting the welfare of the community at large. This power and this duty are to be exerted only in the highest acts of sovereignty and, in the eternal relations of government; they reach and comprehend likewise the interior polity and relations of life which should be regulated with reference to the advantage of the whole society." 4 M.J., *supra,* § 103 (p. 198).

*Lacey* v. *Palmer,* 93 Va. 159 (1896), involves a determination of the constitutionality of an Act of Assembly which was adopted to prevent "pool-selling" on horse races. The text of the opinion which is printed on pages 166 through 173 appears to be singularly pertinent to the issues now before this Court. In addition, the memorandum of law and brief and the reply brief of the Attorney General most effectively deal with the other specific objections mentioned in the demurrers, but not argued to any extent.

In sum, the Court will entertain a sketch for an order sustaining the objection of the plaintiff to the admissibility of the testimony offered by the defendants on December 11, 1970, overruling the demurrers of the defendants and making permanent the terms and provisions of the temporary injunction awarded in the order entered

on October 9, 1970. No evidence having been offered upon which the Court could order restoration of any monies obtained by the defendants as sought in the second prayer of the petition filed in this proceeding, the Court invites the advice of counsel as to the manner in which they propose to proceed further should they be so advised. The Court is most appreciative of the excellent memoranda and able argument of counsel for the parties.