# Richmond

ALBERTIS S. HARRISON, JR., ATTORNEY GENERAL OF VIRGINIA v.
SIDNEY C. DAY, JR., COMPTROLLER OF VIRGINIA.

March 16, 1959.

Record No. 4930.

Present, All the Justices.

The opinion states the case.

*M. Harris Parker, Assistant Attorney General (A. S. Harrison, Jr., Attorney General; Collins Denny, Jr.; F. Elmore Butler; Denny, Valentine & Davenport,* on brief), for the petitioner.

*Frank W. Rogers (Woods, Rogers, Muse & Walker,* on brief), for the respondent.

WHITTLE, J., delivered the opinion of the court.

This is a petition addressed to the court by the Attorney General invoking original jurisdiction in accordance with § 8-714, Code of Virginia, 1950, wherein we are asked to determine the validity of Chapter 453, Acts of Assembly 1954 (codified as Code, §§ 3-79.19 through 3-79.27). The parties have stipulated the exhibits which make up the record.

The Richmond Produce Market Authority, in conformity with the provisions of Title 3, Chapter 7.1, Article 1 of the Code of Virginia, 1950, as amended (§§ 3-79.1 to 3-79.18, inclusive; Chapter 407, Acts of Assembly 1954) has been established and is in existence, and by § 3-79.2 is designated a political subdivision of the Commonwealth. The Authority has made application for a loan from the Produce Market Loan Fund as defined in Title 3, Chapter 7.1, Article 2, Code of Virginia, 1950, as amended (§§ 3-79.19 to 3-79.27, inclusive). In processing the application the Commissioner of Agriculture and Immigration referred the same to State Comptroller Day for action under the provisions of § 3-79.26.

When the application was made the Commissioner of Agriculture and Immigration inquired of Comptroller Day as to whether vouchers issued by the Commissioner would be honored when presented for payment. On September 26, 1958, the Comptroller advised the Attorney General, pursuant to § 8-714, Code of Virginia, 1950, that he entertained doubt as to the constitutionality of the statutory provisions authorizing the use of the loan as contemplated. Whereupon the Attorney General filed the petition in this court praying for a writ of mandamus in accordance with § 8-714, *supra,* and praying that the doubt entertained by the Comptroller be resolved. Thus the constitutionality of the Produce Market Loan Fund Act is here in question.

The sole issue before us is whether there are any constitutional prohibitions against the State, pursuant to this act, making a loan to the Richmond Produce Market Authority, established as aforesaid.

There are two sections of the Virginia Constitution (§§ 185 and 188)* which the Comptroller originally asserted prohibited the loan. ▮ The first question presented is: Do the "credit" and the "stock or obligations" clauses of § 185 of the Constitution operate to make the contemplated loan unlawful?

The credit clause provides that "neither the credit of the State, nor of any county, city or town, shall be, directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporation, * * *", and the stock or obligations clause provides, "* * * nor shall the State * * * subscribe to or become interested in the stock or obligations of any company, association, or corporation, for the purpose of aiding in the construction or maintenance of its work; * * *."

The Attorney General contends that the prohibitions of these clauses are not applicable as they are directed against State support of private business ventures.

In *Almond* v. *Day*, 197 Va. 782, 91 S. E. 2d 660, we had before us the question as to whether the funds of the Virginia Supplemental Retirement System could be invested in the securities of private corporations. There we considered the prohibitions of § 185 of the Constitution. Laying stress upon the "credit" clause, we said:

"Use of the State's funds for purchase of securities for the State's

---

* Sec. 185. "Neither the credit of the State, nor of any county, city or town, shall be, directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporation, nor shall the State, or any county, city, or town subscribe to or become interested in the stock or obligations of any company, association, or corporation, for the purpose of aiding in the construction or maintenance of its work; nor shall the State become a party to or become interested in any work of internal improvement, except public roads and public parks, or engage in carrying on any such work; nor assume any indebtedness of any county, city, or town, nor lend its credit to the same; but this section shall not prevent a county, city, or town from perfecting a subscription to the capital stock of a railroad company authorized by existing charter conditioned upon the affirmative vote of the voters and freeholders of such county, city, or town in favor of such subscription; provided, that such vote was had prior to July first, nineteen hundred and three."

Sec. 188. "No other or greater amount of tax or revenues shall, at any time, be levied than may be required for the necessary expenses of the government, or to pay the indebtedness of the State."

benefit is not an extension of 'credit' which poses any threat to the financial security or welfare of the State. Extending its credit to aid and promote private enterprise was the evil from which the State had suffered financially. The potential danger incurred in lending credit to foster and promote the interests of those who had no rightful claim, in justice or in morals, to the State's help or relief was the evil to be arrested. When the underlying and activating purpose of the transaction and the financial obligation incurred are for the State's benefit, there is no lending of its credit though it may have expended its funds or incurred an obligation that benefits another. Merely because the State incurs an indebtedness or expends its funds for its benefit and others may incidentally profit thereby does not bring the transaction within the letter or the spirit of the 'credit clause' prohibition." 197 Va., at p. 791, 91 S. E. 2d, at p. 667.

The issue on this point then is whether the produce market is generally for the "State's benefit" or strictly for the purpose of promoting "private enterprise".

The Richmond Produce Market Authority has been designated by statute (§ 3-79.2) as a political subdivision of the State, and whether it is such in a strict technical meaning of the term, it is clearly not "private enterprise". A study of the statutes involved leads to this conclusion.

Section 3-79.9 of the Produce Market Authorities Act provides that "the Authority shall not operate the market for profit." This would tend to negate the "private enterprise" theory. The purpose of the market as stated in § 3-79.2 is "to provide facilities for the buying, selling, handling and distribution of perishable farm produce so as to promote the agricultural and industrial development of the Commonwealth and the health, safety, welfare, convenience and prosperity of the inhabitants thereof."

In *Almond* v. *Day*, *supra*, 197 Va., at p. 792, 91 S. E. 2d, at p. 667, we considered the "stock or obligations" clause of § 185 of the Constitution. There it was said:

"It operates on the State only to prevent it from subscribing to or becoming interested in the stock or obligations of a private company when the transaction in question is for the purpose of aiding in the construction or maintenance of the works of such company."

Thus it is clear that the prohibition does not operate unless the State is purchasing the stock or obligations of a "private company"

for the purpose of aiding its construction or maintenance. The Richmond Produce Market Authority is not such a "private company".

The next question involves the "internal improvement" clause of § 185 of the Constitution. Does this clause prohibit the loan in question?

The Attorney General approaches the question by asserting that a produce market such as here contemplated is not an "internal improvement", or, alternately, is not a "prohibited internal improvement". The Comptroller takes the other view, that the market is an "internal improvement" such as is prohibited by § 185.

We approach the question in light of the rule laid down in *Ex Parte Settle*, 114 Va. 715, 77 S. E. 496, where it is said:

"The principles by which this court is governed in considering the constitutionality of a law have been too frequently the subject of judicial decision to require the citation of authority. Every presumption is made in favor of the constitutionality of an act of the legislature. A reasonable doubt as to its constitutionality must be solved in favor of the validity of the law, and the courts have nothing to do with the question whether or not the legislation is wise and proper, as the legislature has plenary power, except where the Constitution of the State or of the United States forbids, and it is only in cases where the statute in question is plainly repugnant to some provisions of the Constitution that the courts can declare it to be null and void." *Shenandoah Lime Co.* v. *Governor* (1914), 115 Va. 865, 867, 868, 80 S. E. 753.

The case of *Shenandoah Lime Co.* v. *Governor, supra,* involved the question of whether the State, in view of § 185 of the Constitution, might operate a lime grinding plant, utilizing convict labor. In discussing the term "internal improvement" it was said:

"Whatever interpretation that term may have elsewhere, it has no such meaning in Virginia, where for nearly if not quite one hundred years it has acquired a definite and well recognized meaning. Each of our Codes, beginning with that of 1819, to and including the Code of 1887, have had chapters entitled 'Works of Internal Improvement'. In using this term in article 185, the late Constitutional Convention [1902] must be presumed, according to established rules of construction, to have used the term only in the definite sense and meaning that had attached to it throughout the history of the State. Its meaning as thus defined and understood throughout the legislation of the State, and the decisions of her courts, has included

and had reference to the channels of trade and commerce, such as turnpikes, canals, railroads, telegraph lines, including in more recent years telephone lines, and other works of a like *quasi* public character. In the past these works, designated as 'works of internal improvement', were sometimes constructed and operated by the State, but generally by corporations composed of private individuals, which, because of the public character of their works, always enjoyed the power of eminent domain, owed duties to the public and were subject to State regulation. These corporations, because of the great need of such improvements at the time, and the difficulty attending the construction of such works, were generally encouraged by State aid, and it was not until the Constitution of 1869 that the State was inhibited from becoming a party to or interested in such works of internal improvement." (115 Va., at pp. 871, 872.) See *Almond* v. *Day, supra,* 197 Va. 782, 91 S. E. 2d 660; *Almond* v. *Day,* 199 Va. 1, 97 S. E. 2d 824.

It will be observed that the definition of the term "internal improvement" referred in the main to "channels of trade and commerce." The use of the words "and other works of a like *quasi* public character" hardly enlarges this definition to include such an undertaking as the Richmond Produce Market Authority.

It was said in *Almond* v. *Day, supra*:

"From the origin of the Commonwealth, down to the present time, it [the State] has constructed many works of internal improvement which are incidental and necessary to the performance of its governmental functions. Among these are the State Capitol, Supreme Court-Library Building, State office buildings, numerous college buildings, and the like. Plainly each of these is a 'work of internal improvement' according to the literal meaning of these words, and yet no one would seriously contend that any of these is within the constitutional prohibition." 199 Va., at p. 7, 97 S. E. 2d, at p. 829.

Clearly, you may have an "internal improvement", according to the literal meaning of the term, which does not fall within the constitutional prohibition.

It was contended in the *Shenandoah Lime Company* case that while the act provided for the working of convicts, in truth and in fact its object was to furnish cheap limestone to farmers and the public generally and thus was in direct competition with private lime companies. There we said:

"We are of opinion that the machinery for grinding oyster shells and limestone rock, and the temporary structures for housing the convicts pending the work contemplated by the act in question, do not come within the meaning of the term 'internal improvements', as that term is used in article 185 of the Constitution." 115 Va., at p. 871.

The Comptroller argues that while § 3-79.2 of the act states that one purpose is allegedly directed to "the health, safety, welfare, convenience and prosperity" of the people of the Commonwealth, this is an unnecessary provision attempting to bring the act under the police power in order to show that it is in furtherance of a proper governmental function, and that such is not necessary as there now exist laws which amply cover the evils here sought to be corrected. This again goes to the wisdom of the legislation, with which we are not concerned. As was said in the *Shenandoah Lime Company* case:

"* * * The police power of the State is not paramount to the Constitution, but its free exercise is never interfered with unless plainly in conflict with the higher law. * * *

"* * * (W)e are warranted, upon abundant authority, in holding that the exercise by the State of its police power, in enacting the 'Convict Lime Grinding Act' under consideration, cannot be defeated because of any conflict with article 185 of the Constitution." 115 Va., p. 874.

The holding in the *Shenandoah Lime Company* case was based on the principle that the provisions of § 185 are not restrictive of the State's exercise of its governmental functions. *Almond* v. *Day, supra,* 199 Va., at p. 8, 97 S. E. 2d, at p. 830.

Cases from jurisdictions other than Virginia which deal with "internal improvement" clauses generally base their holdings on the question of whether or not the undertakings were in furtherance of proper governmental functions. If so, the acts did not violate the constitutional prohibition; if not, they did. See *Gillett* v. *McLaughlin,* 69 Mich. 547, 37 N. W. 551; *State* v. *Murphy,* 237 Ala. 332, 186 So. 487; *State* v. *Bone Creek Township,* 109 Neb. 202, 190 N. W. 586; *Bonsal* v. *Yellott,* 100 Md. 481, 60 A. 593; *In Re Opinion of Justices,* 247 Ala. 66, 22 So. 2d 521.

*In Re Opinion of Justices,* 247 Ala. 66, *supra,* is analogous to the instant case. The constitutional provision there involved is similar

to § 185 of our Constitution. Section 93 of the Alabama Constitution provides:

"The State shall not engage in works of internal improvement, nor lend money or its credit in aid of such; nor shall the State be interested in any private or corporate enterprise, or lend money or its credit to any individual, association, or corporation."

In that case the State of Alabama established a State Market Board, consisting of five members—one the Commissioner of Agriculture and Industry; the others being appointed by the governor. The Board was authorized to construct a market, and the legislature appropriated $300,000 to carry out the act. The appropriation being challenged, the court said:

"Legislative power to regulate as well as to established markets is recognized as being within the police power of the State. * * * It can hardly be denied that the public interest lies in the protection and promotion of agriculture. The welfare of the people is so inextricably tied up with agriculture, as to make its well-being a matter of governmental concern." 22 So. 2d 524.

In discussing the internal improvement clause, the court said:

"Will the State, through the Board authorized by the act, be engaged in works of internal improvement or be interested in private enterprise, if it carries into effect the things authorized by the act? It is clear that such will not be the result." 22 So. 2d 525.

In concluding the opinion the court referred to its former decision in *State* v. *Murphy*, *supra*, wherein it was said:

"* * * It is the peculiar function of the lawmakers to ascertain and determine when the welfare of the people requires the exercise of the State's police powers and what are the appropriate measures to that end, subject only to the power of the courts to adjudge whether any particular law is an invasion of rights secured by the Constitution." 186 So. 493.

It is an established fact that the Commonwealth of Virginia has the power to regulate agriculture and to aid and support its interests. Section 143 of the Constitution establishes a Department of Agriculture and Immigration. This department is under the management and control of the Board of Agriculture and Immigration. Section 144 of the Constitution, in broad terms, says: "The powers and duties of the Board shall be prescribed by law." The legislature, in establishing the Board, has given it broad powers. Section 3-4, Code of

Virginia, 1950, provides: "The Board shall be charged with all matters tending to the promotion of the agricultural interests of the State."

Consistent with this constitutional and statutory background, all of which is based upon the police power of the State, the Virginia legislature enacted Article 1, Chapter 7.1, Title 3, Code of Virginia, providing for the establishment of produce markets. In accordance with the act (§ 3-79.3) the Governor, by proclamation, activated the Richmond Produce Market Authority. This followed an affirmative vote of the Richmond City Council.

Section 3-79.3(a) provides that the Governor may decline to activate an authority when in his opinion there is no substantial need therefor. Section 3-79.2 of the act states that the markets are organized "in order to provide facilities for the buying, selling, handling and distribution of perishable farm produce so as to promote the agricultural and industrial development of the Commonwealth and the health, safety, welfare, convenience and prosperity of the inhabitants thereof."

The legislature, by § 3-79.2, denominated the Authority a political subdivision of the Commonwealth. It is governed by a board of directors appointed by the Governor in accordance with § 3-79.3(b). The Authority is authorized to acquire land, not by condemnation, and to construct and operate a wholesale produce market.

Section 3-79.4(c) authorizes the Authority to borrow money but not to pledge the faith and credit of the Commonwealth. Section 3-79.9 provides, "the Authority shall adjust, if necessary, its tolls, fees, rents and other charges so that the market will not be operated for profit."

After having authorized the establishment of markets for the purposes indicated the legislature then enacted the Produce Market Loan Fund Act to assist them financially. This act, as previously stated, appears as Article 3, Chapter 7.1, Title 3, Code of Virginia. Section 3-79.20 thereof sets forth the purposes for establishing the loan fund as follows:

"In order to promote the general welfare by promoting the efficient and economic handling of farm and food products at wholesale in the interests of the grower, the food trade and the consuming public; in order to reduce greatly increasing marketing costs of food, excessive waste and spoilage; and in order to combat reduced prices to producers and increased costs to consumers caused by inadequate and obsolete market facilities, there is hereby created a

special loan fund to be known as the Produce Market Loan Fund. The purpose of this fund is to provide equity capital for the construction of wholesale produce markets within the Commonwealth."

Loans from this fund are made after "application * * * on forms prescribed by the Commissioner of Agriculture and Immigration," which application "shall give information as to the financial needs of such facility, the use expected to be made of the requested loan, the anticipated sources of all funds required to build the facility, the anticipated revenue of such facility, wherein the public welfare will be promoted by making the loan, and the reason why such facility is expected to be self-liquidating." § 3-79.21.

The Commissioner of Agriculture and Immigration is to satisfy himself "as to the need for such wholesale produce market and as to the financial soundness of such market." § 3-79.22.

The Governor then, if he "deems it advisable", may make such loan upon such security "both as to principal and interest in such manner as the Governor shall prescribe." §§ 3-79.23 and 3-79.24.

It will be seen from the above enactments that the produce market is closely tied in with the Department of Agriculture and Immigration and in some respects is under its supervision.

We are of the opinion that the internal improvement clause, in the light of its historic development and the broad exception thereto for governmental functions, does not in this instance strike down the right of the legislature to authorize a loan of State funds to meet what it considers to be a public need under the circumstances expressed in the statutes involved.

It was not contended in the brief filed on behalf of the Comptroller nor was it argued before us that § 188 of the Constitution had any application to the case here involved.

In our opinion the statutes under consideration do not run counter to the constitutional provisions here relied upon.

Accordingly, the mandamus prayed for is awarded.

*Mandamus awarded.*

MILLER, J., dissenting.

The wholesale produce market authority authorized by the questioned legislation to be established in every city or county having a population of more than 30,000 inhabitants is sought to be justified

under the State's police power. It it avowed to be in furtherance of the health, safety and welfare of the inhabitants, and each market authority is declared to be a political subdivision of the State.

In each county or city wherein such a market authority is activated in accordance with the terms of the act, it is empowered to maintain and operate a produce market for the buying, selling and distribution of perishable farm produce. Sections 3-79.2, 3-79.3.

Under § 3-79.4 each local market authority is authorized to construct and operate the market within or without the city or county upon owned or leased lands, acquire hold and dispose of real and personal property, lease the market facilities or any of them and fix the fees, tolls, rents and charges for their use, borrow money, issue bonds, enter into contracts, employ construction and financial experts, provide facilities for the operation of a restaurant, and sue and be sued.

It is thus evident that instead of possessing and exercising the attributes, powers and functions usually incident to a political subdivision, which the authority is declared to be, the activities and functions of the market are commercial and competitive. Though it is designated a wholesale produce market authority, yet its grant of powers does not limit it or those to whom it may lease its facilities to wholesale trade. It can enter into competition with privately owned wholesale or retail markets in the area.

Section 3-79.20 creates "a special loan fund" known as the Produce Market Loan Fund, the purpose of which is to provide "Equity capital for the construction of wholesale produce markets within the Commonwealth."

Upon authorization by the Governor a loan not exceeding $300,000 may be made by the Commonwealth to a market authority activated in any county or city. § 3-79.23. The loan is to be repaid in yearly installments over a period of twenty-three years with interest at 3 per cent per annum and is to be secured "as to principal and interest in such manner as the Governor may prescribe." § 3-79.24.

Aside from the questions of whether the establishment of a market authority is within the concept of the State's police power and whether it is, in fact, a political subdivision, I am convinced that each local facility to be established constitutes a work of internal improvement. Though its establishment be asserted under the police power and it is declared to be a political subdivision, yet if forbidden by a constitutional limitation, its validity cannot be sustained. The

State's police power must yield to a plain constitutional limitation or prohibition.

Section 185 of the Constitution expressly forbids the State to "become interested in any work of internal improvement, except public roads and public parks * * *." By undertaking to make loans to these local market authorities, the State undoubtedly becomes interested in the enterprise. The sole question to be determined is whether or not the market authority constitutes a work of internal improvement within the meaning of the constitutional provision.

The evils sought to be guarded against, the history of the development of works of internal improvement in Virginia and the unfortunate results experienced by the State as a consequence of its having extended credit and aid in the development and operation of these enterprises are set out at length in *Almond* v. *Day*, 197 Va. 782, 91 S. E. 2d 660. The history, authorities and treatises there cited impel the belief that it was the enunciation of a broad principle that the Constitutional Convention had in mind when it adopted §§ 12, 14, and 15 of Article 10 of the Constitution of 1869, now § 185, and not the enactment of prohibitive legislation against particular activities.

In *Shenandoah Lime Co.* v. *Governor*, 115 Va. 865, 871, 80 S. E. 753, in defining the term "works of internal improvement," we referred to its historical meaning in Virginia and said that throughout the years in legislation and decisions, it "has included and had reference to the *channels of trade and commerce,* such as turnpikes, canals, railroads, telegraph lines, including in more recent years telephone lines, and other *works of a like* quasi *public character. * * *"* (Emphasis added.)

In the *Debates of the Constitutional Convention of 1869* the object and prohibitive purposes of §§ 12, 14, and 15, Article 10, Constitution of 1869, now embodied in § 185 of our present Constitution, were pointedly stated and declared to be applicable to enterprises of this character. When it was then determined that the State should be prohibited from investing in or becoming interested in works of internal improvement, that Convention did so upon the recommendation of its committee on Taxation and Finance. In presenting to the Convention the recommendation of that committee, its chairman, James H. Clements, pointed out the evil intended to be corrected and the unfortunate results that the State had experienced in the past in lending its aid to those enterprises. He said:

"* * * [B]ut taking into consideration the general fact that the State has up to this time derived no real benefit from any interests she had in any internal improvement, in connection with the other fact that capitalists are now to such an extent interested in building up *marts of commerce at various points*, we thought it wise to leave it to the individual interests of the country, believing that any enterprise hereafter mooted, if it possessed within itself genuine merits, would receive such support as would do away the necessity for the State lending her aid to it." 1 *Dabates and Proceedings of the Constitutional Convention of the State of Virginia* (1868) 650.

With knowledge of Virginia's unfortunate financial losses and with the hope of protecting the State from like experiences in the future, Chairman Clements, with prophetic foresight named the identical offending activity, *i.e.*, "marts of commerce at various points" to which the State now intends to lend its aid and funds.

How may it now be rightly said that the Commonwealth is not forbidden by § 185 to lend its funds to these markets at various points throughout the State without disregarding the words and warning of Chairman Clements and the intent of the prohibition.

The decision of *Almond* v. *Day, supra,* is cited and relied upon in the majority opinion. It is readily distinguishable. There the purpose of the challenged legislation, Title 51, chapter 3.2, *et seq.,* Code 1950, as amended, was to allow the State to invest the funds of the Virginia Supplemental Retirement System in recognized marketable securities. The declared purpose of the statute and the motivation for the contemplated investment were solely for the State's benefit. Section 51-111.24(a) bestowed upon the board of trustees of the Virginia Supplemental Retirement System the power to make investment of the System's funds but limited the Board's power so that no investment could be made except "in securities, which, at the time of making are, by statute, permitted for the investment of reserves of domestic life insurance companies." There the securities actually intended to be purchased by the Board were bonds having a rating of not less than "A" in the bond guide rating established by Standard and Poor Corporation, Moody's Investment Service, and Fitch Investment Service, recognized authorities on investments. Under the act now in question the loan is to be made by the State upon recommendation of the Commissioner of Agriculture and Immigration, and "secured in such manner as the Governor shall prescribe."

Under the definition of the term "works of internal improvement" given in *Shenandoah Lime Co.* v. *Governor, supra,* and delegate James H. Clements' statement as to the purpose and intent of the prohibitions, now embodied in § 185, it is clear that when the State lends its funds to these "marts of commerce" for the purpose of fostering the enterprise, as is here evident, and not for the purpose of investing the State's funds, it violates both the spirit and letter of the Constitution.

If these local market authorities may be established in the counties and cities of the Commonwealth, there is no constitutional provision to prevent the establishment and grant of aid by the State to other authorities, such as stockyard market authorities for the buying, butchering, processing, inspection, and selling of meats, or automobile market authorities for the buying, repairing, inspecting and selling of new and used automobiles, and a host of other commercial enterprises of similar character, so long as the authority be classified as a political subdivision of the State.

Here the State is not really investing its funds for its benefit. It is promoting and lending its funds to an activity of unproved financial stability. The evils sought to guarded against in § 185 and the danger to the State's finances are inherent in the undertaking.

Wholly aside from the socialistic character of the present undertaking, it appears to be clearly violative of § 185 of the Constitution. So much of the act as authorizes loans to be made by the Commonwealth to these local produce markets should be declared unconstitutional.