**Richmond**

THE CITY OF CHARLOTTESVILLE, ET AL.

V.

MARTIN H. DEHAAN, ET AL.

Record No. 840437.

November 30, 1984.

Present: All the Justices.

*George B. Little (Roger C. Wiley, Jr., City Attorney; James K. Cluverius; L. B. Cann, III; Roger T. Creager; Little, Parsley & Cluverius, P.C.*, on briefs), for appellants.

*Everette G. Allen, Jr. (John R. Walk; Richard W. E. Bland; Hirschler, Fleischer, Weinberg, Cox & Allen*, on brief), for appellees.

*Amicus Curiae: Virginia Association of Housing and Community Development Officials (A.E. Dick Howard*, on brief), for appellants.

*Amicus Curiae: Norfolk Redevelopment and Housing Author-*
*ity (Francis N. Crenshaw; Crenshaw, Ware & Johnson, on brief),*
for appellants.

THOMAS, J., delivered the opinion of the Court.

This is an appeal in a declaratory judgment proceeding that in-
volves an issue rooted in the Constitution of Virginia. Martin H.
DeHaan and others challenged efforts on the part of the City of
Charlottesville to promote the development of a hotel-convention
center in the Vinegar Hill Redevelopment area of the City. The
proposed complex had an estimated construction cost of $23.9
million. The developer, Charlottesville Properties, Ltd., was re-
quired to advance $2.0 million in earnest money and to borrow
$12.4 million from a private lender. The remaining $9.5 million
was to be lent to the developer by the Charlottesville Redevelop-
ment and Housing Authority (the Authority). The Authority was
to obtain the loan money from the City. The City passed a $9.5
million bond ordinance which declared that the proceeds from the
sale of the bonds were to be transferred to the Authority for its
use in carrying out its public purposes, including the Vinegar Hill
Redevelopment Project. DeHaan argued that the City's attempt
to give money to the Authority, which in turn would lend money
to the developer, was an effort to lend, indirectly, the credit of the
City to a private entity in violation of the "credit clause" of Arti-
cle X, Section 10 of the Constitution of Virginia.*

The trial court ruled in DeHaan's favor, finding that the City's
involvement in the redevelopment effort violated the credit clause.
In a letter opinion, the trial court noted that securing a developer
for the Vinegar Hill site was the "culmination of exhaustive ef-
forts" by the City and the Authority. The trial court acknowl-
edged that the City's involvement in the redevelopment effort was
in full compliance with various provisions of the Housing Authori-
ties Law, Code §§ 36-1 *et seq.* Yet, the trial court perceived a
constitutional violation essentially because it reached the following
four conclusions: 1. that the money the City would give the Au-
thority would be lent by the Authority to a private developer; 2.

---

* That constitutional provision reads in pertinent part, as follows:
Neither the credit of the Commonwealth nor of any county, city, town, or regional govern-
ment shall be directly or indirectly, under any device or pretense whatsoever, granted to or
in aid of any person, association, or corporation . . . .

that the developer would not have been able to secure the $12.4 million loan from the bank without the funds it would receive indirectly from the City; 3. that the City's money would be invested in privately owned facilities; and 4. that the intent of the bond ordinance was to grant indirectly the credit of the City to a private interest which could not itself obtain credit. According to the trial court, the facts fell squarely within the ambit of *Button* v. *Day*, 208 Va. 494, 158 S.E.2d 735 (1968), with the result that, though the redevelopment effort involved a "laudable public purpose," the City's involvement was impermissible.

On appeal, the City contends that the trial court did not properly apply the so-called "animating purpose test" and, as a result, did not analyze the transaction to determine whether it was primarily for a public purpose or primarily for a private benefit. The City further contends that, had the animating purpose test been properly applied, the trial court would have seen that the benefit to the developer was only incidental to the overall redevelopment effort. In short, the City contends that upon proper analysis, it is apparent that the primary motivation behind its efforts to promote the redevelopment of a once-blighted area in the heart of the City was to serve the purposes of the Housing Authorities Law and therefore those efforts were not unconstitutional. We agree.

The starting point in reviewing the constitutionality of legislative actions is recognition of the presumption of validity that attaches to such actions. In opinion after opinion, we have emphasized the very narrow confines in which the courts must operate when considering the constitutionality of legislative activities. In *Mumpower* v. *Housing Authority*, 176 Va. 426, 444, 11 S.E.2d 732, 739 (1940), we said, quoting *Danville* v. *Hatcher*, 101 Va. 523, 532, 44 S.E. 723, 726 (1903), that the "best indications of public policy are to be found in the enactments of the Legislature." In *Mumpower*, we also noted that the legislature has wide discretion in determining the best interests of the public, that every possible presumption is to be indulged in favor of the validity of a statute, and that a legislative enactment must be sustained unless " '[i]t is clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.' " 176 Va. at 443, 11 S.E.2d at 738 (citing *West Brothers Brick Co.* v. *Alexandria*, 169 Va. 271, 192 S.E. 881, *appeal dismissed*, 302 U.S. 658 (1937), *Gorieb* v. *Fox*, 274 U.S. 603 (1927), and *Village of Euclid* v. *Ambler Realty Co.*, 272 U.S.

365 (1926)). To similar effect is *Harrison* v. *Day*, 200 Va. 750, 754, 107 S.E.2d 585, 587-88 (1959), a credit clause case which quotes with approval the following language from *Ex Parte Settle*, 114 Va. 715, 719, 77 S.E. 496, 497 (1913):

> "Every presumption is made in favor of the constitutionality of an act of the legislature. A reasonable doubt as to its constitutionality must be solved in favor of the validity of the law, and the courts have nothing to do with the question whether or not the legislation is wise and proper, as the legislature has plenary power, except where the Constitution of the State or of the United States forbids, and it is only in cases where the statute in question is plainly repugnant to some provisions of the Constitution that the courts can declare it to be null and void."

These principles are sufficiently important that they were reiterated in *Button* v. *Day*, 208 Va. 494, 158 S.E.2d 735 (1968), the primary case relied upon by DeHaan. There, though we struck down a statute as violative of the credit clause, we acknowledged the "established principle that every reasonable doubt should be resolved in favor of an act of the legislature" and went on to state that "only where such an act plainly exceeds constitutional limitations, should the court strike it down." *Id.* at 502, 158 S.E.2d at 740.

In the present appeal, the foregoing principles are of great importance because the trial court's decision has effectively declared void the actions of three separate governmental entities. First, the trial court's decision necessarily means that portions of the Housing Authorities Law are unconstitutional, at least as applied. This is so because every action taken by the City and the Authority was in compliance with a statutory provision. Code § 36-7 authorizes cities to donate money to housing authorities and authorizes cities to raise such money by selling bonds. Code § 36-19(f1) authorizes housing authorities to make loans or grants for the prevention and elimination of slum or blighted areas. Among other things, Code § 36-19(f3) authorizes housing authorities to make loans for assistance in construction of commercial buildings. Code § 36-48(a) contains a finding by the General Assembly that the existence of blighted areas causes the spread of disease and crime and constitutes a menace to the health, safety, morals, and

welfare of the residents. Code § 36-48(b) contains a finding by the General Assembly that the clearance, replanning, rehabilitation, and reconstruction of blighted areas are necessary for the public welfare, are public uses and public purposes, and are governmental functions of grave concern to the Commonwealth.

Second, the trial court's decision declares unconstitutional various legislative acts of the City. The City declared the Vinegar Hill area to be blighted. The City ratified the Authority's redevelopment plan as required by Code § 36-51. The City, relying upon Code §§ 36-6 and 36-52, entered into a cooperation agreement with the Authority in furtherance of the redevelopment plan. The City declared that it was in the best interest of its citizens for the hotel-convention complex to come to fruition. The trial court's decision overturns each of these judgments.

Third, the trial court's decision effectively declares unconstitutional the Authority's approach to redeveloping the Vinegar Hill area to insure that the blight will not return. After careful study, the Authority concluded that the hotel-convention complex was essential to its responsibility to redevelop the area. Moreover, the Authority concluded that Charlottesville Properties was the appropriate developer and that the package the Authority put together with the developer was the best approach to achieve the desired result of redeveloping the once-blighted area. Again, the trial court's decision has pushed to one side the various findings and judgments that the Authority made pursuant to the powers and duties derived from the statute.

The transactions complained of by DeHaan should have been analyzed in light of their dominant or animating purpose. In *Almond* v. *Day*, 197 Va. 782, 91 S.E.2d 660 (1956), we considered whether certain investments made by the Virginia Supplementary Retirement System violated the credit clause of the Constitution of Virginia, then § 185. We said they did not. There we announced in unmistakable language that the case turned on the purpose behind the investments: "[T]he moving consideration and motivating cause of a transaction are the chief factors by which to determine if it is prohibited by § 185. Whether or not a transaction contravenes the 'credit clause'. . .depends upon its animating purpose and the object that it is designed to accomplish." 197 Va. at 790, 91 S.E.2d at 666-67. In holding that the case did not involve a credit clause violation, we elaborated upon the animating purpose test:

When the underlying and activating purpose of the transaction and the financial obligation incurred are for the State's benefit, there is no lending of its credit though it may have expended its funds or incurred an obligation that benefits another. *Merely because the State incurs an indebtedness or expends its funds for its benefit and others may incidentally profit thereby does not bring the transaction within the letter or the spirit of the "credit clause" prohibition.*

*Id.* at 791, 91 S.E.2d at 667 (emphasis added). *Accord Troy* v. *Walker*, 218 Va. 739, 241 S.E.2d 420 (1978); *Fairfax County* v. *County Executive*, 210 Va. 253, 169 S.E.2d 556 (1969); *Harrison* v. *Day*, 202 Va. 967, 121 S.E.2d 615 (1961); *Harrison* v. *Day*, 200 Va. 750, 107 S.E.2d 585 (1959). In *Button* v. *Day*, 208 Va. 494, 158 S.E.2d 735 (1968), the case relied upon most heavily by the trial court, we made clear that the animating purpose test applies in the analysis of credit clause problems. There, though we struck down the particular statute, we wrote as follows: "[A]dmittedly, we have said that if the animating purpose of a transaction and the object it is designed to accomplish are for the State's benefit, there is no lending of the State's credit, even though private interests might incidentally benefit." 208 Va. at 503, 158 S.E.2d at 741. Thus, the animating purpose test was the law of Virginia both before and after *Button* v. *Day*.

In its letter opinion, the trial court made reference to the animating purpose test. However, the trial court never specifically stated whether the various transactions were animated by a public as opposed to a private purpose. Nevertheless, given the trial court's disposition of this matter, we can infer that in the trial court's view, the transactions were not animated by a public purpose. In reaching its conclusion the trial court wrote as follows:

It is clear, and counsel for the defendants at our January 7, 1984 conference candidly admitted that the City of Charlottesville wants to sell bonds in order to obtain funds to give to the Authority, which in turn will lend the same to Charlottesville Properties, Ltd. It is also evident that Charlottesville Properties, Ltd. cannot secure the United Virginia Bank loan without the funds it will receive indirectly from the City. Furthermore, the public funds so appropriated will be invested in privately owned facilities whose activities the de-

fendants hope will generate the public benefits aforementioned. This brings us squarely within the 1968 *Button* v. *Day* admonition that although a laudable public purpose may lie behind an ordinance, it is constitutionally infirm if the method of accomplishment of the purpose is improper, i.e., the intent of the ordinance being to grant indirectly the credit of the City of Charlottesville to a private interest which could not itself obtain credit. I conclude, therefore, that although the City has acted within the scope of applicable statutes, the result thereof is constitutionally impermissible.

In our opinion, the trial court reached the wrong conclusion.

■ To determine whether the City's involvement in the events complained of was primarily for a public purpose, we must consider the circumstances surrounding the Vinegar Hill Redevelopment Project. The Vinegar Hill section of Charlottesville was declared a blighted area in 1960. In that year the Authority recommended and the City adopted a redevelopment plan for the area. By 1967, the Authority had acquired all of the land in the redevelopment area. By 1973, most of the land had been sold for redevelopment. However, by 1978 the land, including the parcels here in dispute, had not been developed. The redevelopment plan was amended through February 1982. In the 1982 version of the plan its objectives included, among other things, "[e]limination through total clearance, of a slum, blighted and deteriorated area," and "[c]reation of an attractive unified retail-office-hotel-conference center complex. . . ."

In 1978, the City, mindful of the statutory requirement that the land be redeveloped, formed a citizens group to advise the City concerning the best use of the property. The citizens group proposed a hotel, conference center, and parking garage. In July 1978, the City retained a consulting firm to refine and develop the citizens' proposal. Various studies established that a complex such as the kind proposed by the citizens group would generate approximately $13.7 million in new tax revenues over twenty years, 340 permanent jobs, social and cultural benefits, and other advantages.

After the plan was refined, the City entertained proposals from several developers. One proposal was accepted in 1979; however, that arrangement fell through in 1980. In 1981, the City reached agreement with another developer; however, this second arrange-

ment fell through in late 1982. In November, 1982, the City reached agreement with a third developer — which subsequently assigned its interest to another developer. It is the City's efforts in support of this third arrangement that were attacked by DeHaan.

We think that the City has sought all along to promote its interests and the interests of its citizens rather than to help a private developer make money. The Vinegar Hill project proved to be difficult to complete. Though the plan was to clear the blight and prevent its recurrence, the effort has taken more than twenty years. Though the blight was removed by 1967, the land here in question is only now, 17 years later, being redeveloped. The attempt to get private parties to buy the land and redevelop it did not work with regard to the hotel-conference center site. In addition, private developers did not flock to this deal; they had to be lured into it by the Authority and the City. Even so, two developers dropped out before a developer was found who stayed. This project is the last step in the City's two-decade-long struggle to redevelop an area that had been a sore spot in the City's downtown section. Moreover, the development will, according to studies relied on by the City, generate substantial financial and other benefits for the City. In our opinion, the City acted for its own good, not for the good of the developer.

Any benefit to the developer was incidental — not insignificant or inconsequential — but incidental. That is, it occurred as a result of the City's efforts to serve the City's interests. We have long made clear that incidental benefits to private entities do not make unconstitutional efforts by governmental entities to serve the needs of the government. *See Harrison* v. *Day*, 202 Va. at 972, 121 S.E.2d at 620. In *Development Authority* v. *Coyner*, 207 Va. 351, 150 S.E.2d 87 (1966), we held that there was no credit clause violation; but in a portion of the opinion, in which we analyzed whether the statute in question was for a public purpose, we talked about incidental benefits: "Even though some private individual or corporation incidentally benefits from the financing, construction and use of the proposed facility, its public purpose and character are not destroyed." *Id.* at 357, 150 S.E.2d at 93. *Accord Fairfax County* v. *County Executive*, 210 Va. 253, 263, 169 S.E.2d 556, 562 (1969). *See Rudder* v. *Housing Authority*, 219 Va. 592, 597, 249 S.E.2d 177, 179 (1978), *appeal dismissed*, 441 U.S. 939 (1979).

█ Turning our attention to each of the factors assigned by the trial court for declaring the City's actions unconstitutional, we reach conclusions different from those reached by that court. The trial court was concerned that the money lent to the Authority would be lent in turn to the developer. On the facts of this case, where the City was acting for its own benefit, nothing is wrong with the possibility pointed to by the trial court.

█ Next, the trial court concluded that the developer could not secure its $12.4 million loan from United Virginia Bank "without the funds it will receive indirectly from the City." We have reviewed the loan papers and we reach a different conclusion. In no place does either the City or the Authority guarantee the loan from the bank to the developer and nowhere does the bank require such a guarantee. What the bank required in its commitment letter reads as follows:

> Our obligation to fund any portion of the Loan is subject to your obtaining secondary financing from CRHA. . . satisfactory to us in the amount of $9,500,000 to be used in connection with the construction and development of the Project.

Significantly, the agreement between the Authority and the developer contains a similar statement in the following language:

> The willingness of CRHA to make the loan and enter into the lease as set forth in Paragraphs A and B above is subject to the following terms and conditions:
> 1. The obtaining from Citi-Corp or other lender prior to commencement of construction of the Vinegar Hill Facility of a loan in the amount of at least Twelve Million Four Hundred Thousand Dollars ($12,400,000.00). . . .

Neither the bank's condition nor the Authority's requires the developer to rely on the credit of another in order to secure the loans. Both provisions are designed to insure that neither lender will put up its money unless the other lender is still participating in the transaction. The trial court incorrectly concluded that the condition in the bank's commitment letter meant that the bank was relying on the credit of the City in loaning the developer the $12.4 million. If that were so, upon the developer's default, the City would have been responsible for repaying the $12.4 million loan. That could not have happened here.

█ The trial court's next concern was that the money was to be invested in a privately owned facility. In making that statement, the trial court made no reference to the undisputed fact that the Authority will retain ownership of the land and will lease it to the developer. The trial court also made no mention of the several controls the Authority retained, by contract, over the operation of the facility.

█ The trial court was of the view that the benefits expected from the project were speculative. However, the City had already made the judgment that the expected benefits were reliable. The trial court exceeded its authority in attempting to redetermine what amounts to a legislative finding.

█ Finally, the trial court was of opinion that the instant matter fell squarely within the purview of *Button* v. *Day* (1968). However, *Button* is distinguishable. There, we declared unconstitutional the Virginia Industrial Building Authority Act, Acts 1966, c. 689. The stated purpose of that act was "to stimulate a larger flow of private investment funds from banks, insurance companies and other financial institutions and sources into industrial projects throughout the Commonwealth." Code § 2-57.03(e) as enacted Acts 1966, c. 689. The means of accomplishing this purpose were as follows: an applicant to the Authority was first required to secure a commitment from a private source to fund the applicant's project. Once that commitment was in hand the applicant could present his business plan to the Authority. If the Authority was of the view that the plan would promote industrial development and stimulate jobs, it could agree to guarantee up to 40% of the commitment from the private lender. In short, the State proposed to go into the business of guaranteeing loans from one private entity to another. We said such a plan was precisely the evil the credit clause sought to prevent. We wrote as follows:

The Act before us is stamped indelibly with the purpose of granting credit in aid of private interests upon the faith of State funds — the precise thing the Constitution says shall not be a proper function of government. Granting credit with State funds is the sole, quickening function of the Authority, the very core of its existence. To withhold the use of State funds or to withdraw the power to grant credit would unavoidably bring about the early demise of the whole scheme.

208 Va. at 503, 158 S.E.2d at 741. We stated that *Button* was unique in that the Act in question called for State funds to be "set aside and held for the sole purpose of guaranteeing future payment of defaulted loans of private debtors." *Id.* at 504, 158 S.E.2d at 741.

The arrangement in the instant appeal is altogether different. Neither the Housing Authorities Law nor the City's efforts to support development of the hotel complex had the sole quickening purpose of granting credit with State funds. Nothing in the instant appeal suggests that the City has set aside money to pay the developer's bad debts. On the contrary, here the City has made an investment in its future in order to complete a redevelopment project more than twenty years in the making and in order to provide jobs, more tax revenues, and other benefits for its citizens.

Despite these differences, DeHaan asserts that *Button* nevertheless requires us to find a credit clause violation here. He quotes language from *Button* as follows:

It cannot be gainsaid that stimulation of the development of industry is a public purpose warranting governmental participation to achieve the desired objective of creating additional employment for the citizens of the State. It does not follow, however, that because the goal is meritorious, every method which might, in some way, aid its accomplishment is therefore constitutionally permissible; or, to put it another way, that because the purpose is public, anything done in furtherance thereof becomes, *a fortiori*, a proper governmental function.

208 Va. at 503, 158 S.E.2d at 741. DeHaan argues from this language that the presence of a public purpose in this case does not shield the City's actions from the operation of the credit clause. However, in our opinion, DeHaan misinterprets the language he quotes from *Button*. There, this Court spoke in the context of striking down legislation "stamped indelibly with the purpose of granting credit in aid of private interests upon the faith of State funds." *Id.* at 503, 158 S.E.2d at 741. *Button* asserts that such legislation will not be saved by the mere presence of a concomitant public purpose.

That principle has no application here. Here, the City and the Authority sought out a private developer not for the purpose of

granting credit in its aid, but for the purpose of redeveloping land acquired pursuant to the Housing Authorities Law. *See Holston Corp.* v. *Wise County*, 131 Va. 142, 109 S.E. 180 (1921). In *Holston*, the county made a contract with a local quarry pursuant to which the quarry agreed to sell, at a fixed price, crushed stone for use in certain road work to be done by the successful bidder on the county's road work contract. In return for the fixed price, the county guaranteed payment to the quarry. We held that the county's guarantee of payment did not violate the credit clause because the county's guarantee was for the county's benefit, not for the benefit of the prevailing contractor.

In a long line of cases upholding the Housing Authorities Law, we have recognized that the purchase, clearing, and resale for development of blighted land is a proper governmental function. *See Infants* v. *Virginia Hous. Dev. Auth.*, 221 Va. 659, 670-71, 272 S.E.2d 649, 655-56 (1980); *Hunter* v. *Redevelopment Authority*, 195 Va. 326, 336-37, 78 S.E.2d 893, 899-900 (1953); *Mumpower* v. *Housing Authority*, 176 Va. 426, 437, 11 S.E.2d 732, 735 (1940). The language DeHaan lifts from *Button* was never intended to call into question the means by which private developers receive financing under the Housing Authorities Law, and we decline DeHaan's invitation to apply *Button* so as to make such a sweeping prohibition.

In light of all the foregoing, we find no violation of the credit clause in the City's ordinance of October 27, 1983, authorizing the issuance of $9.5 million in general obligation bonds and bond anticipation notes and its resolution of October 27, 1983 as amended by resolution of January 3, 1984 appropriating $9.5 million to the CRHA for use in connection with the Vinegar Hill Redevelopment Project.

Therefore, we will reverse the judgment of the trial court.

*Reversed and final judgment.*

POFF, J., dissenting.

I dissent. The majority tries but fails to distinguish *Button* v. *Day*, 208 Va. 494, 158 S.E.2d 735 (1968).

The City's urban redevelopment project has a legitimate public purpose and, politically, the method of financing chosen by City Council may have been the most prudent option. But political

judgments are not the province of this Court. Our sole function in this appeal is to determine whether the means chosen to achieve the end offend Article X, § 10 of the Virginia Constitution, which provides that "[n]either the credit of the Commonwealth nor of any . . . city . . . shall be directly or indirectly, under any device or pretense whatsoever, granted to or in aid of any person, association, or corporation. . . ." If so, we must say so, even if the statutes upon which the City relies seem to authorize the means employed here. "It cannot be gainsaid that stimulation of the development of industry is a public purpose . . . . It does not follow, however, that because the goal is meritorious, every method which might, in some way, aid its accomplishment is therefore constitutionally permissible. . . ." *Button* v. *Day*, 208 Va. at 503, 158 S.E.2d at 741.

On October 27, 1983, City Council adopted resolutions which (1) ratified the Cooperation Agreement, (2) authorized the issuance of $9.5 million in bonds backed by the faith and credit of the City, and (3) appropriated the bond proceeds to CRHA to be used as a loan to Charlottesville Properties. On the same day, the same members of City Council, acting in their capacity as officers of CRHA, adopted a resolution ratifying the Agreement and committing CRHA to lend the same money to Charlottesville Properties.

In short, City Council pledged the credit of the City to borrow money from the public to be advanced to CRHA for the exclusive purpose of making a loan at bargain rates to a private commercial concern. CRHA was nothing more or less than an artificial conduit through which the City channeled the proceeds from the sale of the bonds. The entire process, although artfully structured and skillfully designed, was a transparent "device or pretense" for the granting of credit, albeit "indirectly", in aid of private persons. That is precisely what the Constitution expressly forbids.

Because the legislature cannot permit what the Constitution forbids, the statutes upon which the City relies, if construed to validate its evasion of the credit clause, would be unconstitutional as applied. The trial court's ruling went no further; facial constitutionality was never under challenge.

Read together, the Virginia Housing Authorities Law, Code §§ 36-1 *et seq.*, and the Virginia Housing Development Authority Act, Code §§ 36-55.24 *et seq.*, afforded City Council an alternative method of financing the hotel-conference center complex

which would have escaped the constraints of the credit clause. A city is authorized to create a housing authority, Code § 36-4, and a housing authority is authorized to issue and sell *revenue* bonds to raise money for urban redevelopment, Code § 36-29. This method of financing would have been constitutionally sufficient because Code § 36-29(b) provides that a city shall not be liable on bonds issued by a housing authority. Obviously, bonds are more marketable when backed by the faith and credit of a city, and that is why City Council chose to pledge the City's credit in aid of this private project. The proceeds from the bonds, raised on the City's credit and advanced to Charlottesville Properties, were the keystone of the financial arch. Yet, the majority concludes that the benefit conferred upon the private developer was "incidental".

This Court should apply the principles underlying the constitutional analysis in *Button* v. *Day*, obey the explicit constitutional command, and affirm the judgment of the trial court.

COCHRAN and RUSSELL, JJ., join in dissent.